[No. 30448.   Department Two.   April 6, 1948.]

ALEX BLEYHL et al., *Respondents*, v. TEA GARDEN PRODUCTS
COMPANY, *Appellant*.[1]

[1]Reported in 191 P. (2d) 851.

448

Brown & Hawkins, for appellant.

Walter V. Swanson, for respondents.

STEINERT, J.—Plaintiffs brought suit seeking to recover damages alleged to have resulted from defendant's breach of implied warranty as to fitness of a supply of grapevine roots which defendant had previously sold and delivered to plaintiffs. The cause was tried to a jury, which returned a verdict in plaintiffs' favor. The court entered judgment on the verdict. Defendant appealed.

Respondents Alex Bleyhl and Carl Bleyhl are brothers. Together, they own a number of ranches in Yakima county, upon which they conduct various kinds of farming operations. They also are jointly interested in several business enterprises, among which are two grain and feed stores in the Yakima valley, one located in Grandview and the other in Sunnyside. Appellant, Tea Garden Products Co., is a corporation engaged in the business of processing grape and other fruit juices and making jams and jellies, in this state.

In the summer of 1945, appellant decided to establish in Grandview a plant for processing grapes, apples, and other fruits. In order to be assured of a sufficient supply of grapes for its processing plant on and after its completion in 1947, appellant contracted with many landowners in the Yakima valley for their prospective grape acreage. Under those contracts, which were in writing, the respective landowners agreed to plant in 1946 a certain number of acres to Concord grapes, on lands described in the contracts, and thereafter to sell to appellant their entire crops of such grapes, subject to certain quality requirements. The landowners further agreed to prepare and plant their vineyards on premises described in the contracts, "using vines satisfactory" to appellant.

At that period of time, Concord grapevine roots, or "grape roots" as they were termed at the trial, used for

planting purposes, were very scarce, and, in order to obtain the amount thereof required by its contracts with the various landowners, appellant entered into negotiations and concluded arrangements therefor with several nurseries in the East, Middle West, and South. Upon receipt of shipments of such grape roots from the nurseries, appellant sold and delivered to the landowners the supply thereof required by them in planting their specified acreage.

In the early part of 1946, appellant and respondents entered into a written contract, of the nature generally described above, wherein respondents agreed to plant in that year forty-four acres to Concord grapes, using vines satisfactory to appellant, and thereafter, during the period of 1948-1952, to sell to appellant their entire crops of such grapes, which appellant agreed to purchase, provided the fruit met the requirements of quality and condition.

Pursuant to that contract and in order to carry out its terms, respondents entered into another, and separate, contract with appellant, evidenced by a purchase order, whereby respondents were to purchase from appellant, and the latter was to sell and deliver to respondents, 25,500 Concord grapevine roots, one year old, of No. 1 quality, at the price of eight cents each, to be delivered about April 5th of that year.

On April 1, 1946, there arrived in Grandview a refrigerator freight car containing a shipment of grapevine roots which appellant had purchased from a nursery in Arkansas, and from which appellant intended to, and did, supply such roots to the local landowners, including respondents, for whose acreage appellant had previously contracted.

On April 3, 1946, the freight car was opened in the presence of Mr. E. V. Wyant, field man, purchasing agent, and salesman for appellant. When the car was opened, "a big gush of steam" issued from within, rolling out in clouds for about a half hour, and continuing for some time thereafter in lesser amounts. Upon inspection, it was discovered that the car contained wet straw, approximately six inches deep, covering the grape roots. The straw was begrimed with

a white mold, an inch or so thick. The intensity of the heat in the straw was such that, according to the testimony of two witnesses, they could not hold their hands in it for more than a very short time. A thermometer, placed in the straw, registered its full maximum reading of 110 degrees. These conditions were unknown to respondents at the time of the arrival and opening of the car, and did not become known to them until sometime thereafter.

An expert witness, who was manager of a grape processing plant in Grandview, was called by the respondents and testified at the trial that he saw the condition of the freight car and the roots at the time the car was opened. He stated that, in his opinion, the heating of the car would have the effect of weakening the roots to such an extent that, when put in the ground, they would not make "a thrifty growth." He further testified that, in his opinion, the roots in the freight car were not in a healthy condition; that they had poor root growth and poor top growth; that they did not appear to him to be No. 1 roots; and that they were improperly packed for shipping.

The freight car was unloaded shortly after it had been opened, and the grape roots were then placed in the railroad company's freight depot. On the following day, the roots were distributed by appellant's representatives to various landowners who had contracted therefor. Respondents' quota of grape roots was accepted and hauled away by their employee, Mr. Ervin Erickson, who had worked for a number of years for a nursery and in that time had handled grape roots to some, though not a great, extent.

Mr. Erickson testified that, when he accepted delivery of the first load of grape roots, they did not "look very good" to him, and that he took four bundles of them back to the freight depot. He had considerable difficulty in getting any of appellant's representatives to examine these bundles, but finally prevailed upon Mr. Wyant to look at them. Wyant cut into some of the roots with a penknife, and two of the bundles he pronounced "doubtful," but said that the other two were "all right." The two doubtful bundles were

replaced with two others in the next load and were accepted by Erickson on the assurances given by Wyant.

Erickson transported respondents' quota of roots to a cold storage plant maintained by respondents and there stored them in three-foot piles on scows, or flats, with the root ends extending outward. These piles were then covered with shingle tow and kept moist.

During the latter part of April, respondents commenced planting the grape roots on two of their tracts of land as agreed in their contract with appellant. The planting was completed approximately twelve days later, between the 6th and 10th days of May, 1946. Prior to planting, a few of the roots were trimmed by respondent Alex Bleyhl and the rest by a woman who worked for respondents in their storage plant.

The planted roots were watered and cultivated, but most of them failed to grow. Although Mr. Wyant, heretofore mentioned, testified by deposition that in June, 1946, one of the tracts planted by respondents had an 80% growth of roots, the evidence showed that later on in the summer the number of healthy plants was considerably less than this stated percentage. Mr. Erickson testified that on one tract less than 5% of the plants were "real strong," 20% or 25% of them were "spindling ones," and the rest failed to grow. Respondent Carl Bleyhl testified that about 15% of the plants were good, healthy, full-grown plants. Respondent Alex Bleyhl testified that approximately 10% or 20% of the plants grew, but presented a spotted appearance in the rows. The normal failure of grape roots is about 15% or 20%.

During the latter part of June or the first of July, 1946, Mr. Wyant, at respondents' request, visited one of their tracts where the grape roots had been planted. At that time, according to Mr. Erickson's testimony, Wyant inspected the field and some of the plants and then stated to respondent Carl Bleyhl: "It don't look very good." Mr. Bleyhl then asked Wyant whether respondents should plow up the field, to which Wyant replied that he had no authority in that respect, but that "there would be a man over

next week." However, the "man" referred to by Mr. Wyant never came.

In the early part of July, 1946, respondents first learned of the condition of the freight car in which the grape roots had been shipped, arriving in Grandview on April 1st. Thereafter, respondents made inquiries and investigation with the view of determining why the roots had failed to grow.

On October 3, 1946, respondents notified appellant that they claimed a breach of warranty of fitness with respect to the grape roots. Appellant denied liability. This suit was thereupon instituted.

At the trial and upon the conclusion of respondents' evidence, appellant challenged its sufficiency and later moved for a directed verdict. These motions were denied by the court, and the cause was submitted to the jury, which rendered a verdict in respondents' favor. Thereafter, appellant moved for judgment notwithstanding the verdict, and this was likewise denied. Upon entry of judgment on the verdict, this appeal was taken.

Among the issues of fact presented to the jury were: (1) whether the storage of the grape roots by the respondents in their cold storage plant prior to planting was proper; (2) whether the roots were properly planted and cultivated by the respondents; and (3) whether or not the failure of the roots to grow was caused by improper storage, planting, or cultivation on the part of respondents, or whether, on the contrary, it was caused alone by their defective condition. The evidence on all of these enumerated issues was in serious conflict. The jury was fully and properly instructed thereon, and its verdict indicates that it resolved them in respondents' favor. Appellant's assignments of error do not challenge the verdict of the jury in so far as it determined the particular issues above enumerated, and we therefore shall regard it as an established fact that the roots were properly stored, planted, and cultivated by the respondents, but failed to grow because of their defective condition.

Appellant's principal assignments of error present the question of whether respondents' evidence, taken in its entirety, was sufficient to make a case for the jury and to support the verdict subsequently rendered by it, as against appellant's motions for nonsuit, for directed verdict, and for judgment notwithstanding the verdict.

We have repeatedly held that such motions admit the truth of the evidence of the party against whom the motion is made and all inferences that reasonably can be drawn therefrom, and require that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265; *Fiskaa v. Miller*, 27 Wn. (2d) 242, 177 P. (2d) 707; *Williams v. Hofer, ante* p. 253, 191 P. (2d) 306; and cases cited therein.

Another rule as definitely settled is that, in a judicial ruling upon any of such motions, no element of discretion is involved, and the motion can be granted only when it can be held as a matter of law that there is no evidence nor reasonable inference from evidence to sustain a verdict for the opposing party. *Knight v. Trogdon Truck Co.*, 191 Wash. 646, 71 P. (2d) 1003; *Graham v. Police & Firemen's Ins. Ass'n*, 10 Wn. (2d) 288, 116 P. (2d) 352; *Williams v. Hofer, supra.*

With these rules in mind, we shall consider appellant's several contentions. Its first contention, as expressed in its first assignment of error, is that:

"The court erred in holding it to be a jury question that respondents could recover even though the roots were bad when planted."

As heretofore stated, the jury had the right to find, and obviously did find, that the grape roots were defective *at the time they were received by the respondents.* Appellant's assignment of error, however, is based upon its assertion that the uncontradicted evidence established that the respondents knew, or in the exercise of ordinary care should have known, that the grape roots were defective prior to and *at the time they were planted.*

With that alleged factual premise, appellant bases its contention upon a section of the uniform sales act, Rem. Rev. Stat., § 5836-15 (3) [P.P.C. § 860-9], which it contends is controlling in the instant situation. That section reads:

"If the buyer has *examined the goods,* there is no implied warranty as regards defects which such examination *ought to have revealed."* (Italics ours.)

■ As heretofore stated, respondents' cause of action is based upon an alleged breach of an implied warranty. It is true, as disclosed by the record, that respondents and certain of their employees did make some examination of the roots, but it is equally true that neither the respondents nor any of their employees were grape root experts. Appellant argues nevertheless that the evidence is conclusive to the effect that respondents and their agents knew, or in the exercise of ordinary care should have known, of the defective condition of the roots, and that therefore they could not recover for breach of implied warranty of their condition.

By the terms of the sales contract, appellant was to furnish respondents No. 1 grape roots. Although the quality and condition of the roots were questioned by Mr. Erickson, respondents' employee, at the time he took delivery of the first load, he was at least impliedly assured by Mr. Wyant, a grape root expert, field representative, and salesman for appellant for over seventeen years, that the grape roots were what they were supposed to be. It is plain from the evidence that Mr. Erickson, representing respondents, relied upon those assurances.

Appellant called as a witness in its behalf Mrs. Vera Roberts, the woman who, while in the employ of the respondents, had trimmed the major portion of the grape roots which respondents subsequently planted. Appellant relies heavily upon her testimony to the effect that, at the time of trimming the roots, some of them appeared to be dry, in poor condition, and were covered with mold. However, on cross-examination, she testified that she herself and her husband had purchased from appellant 2,400 grape roots for their own use; that the roots which they purchased were from

the same shipment as that from which respondents were supplied; that the roots which she and her husband had purchased and which she herself had trimmed were subsequently planted; and that thereafter it was discovered that 1,465, or 60%, of them were dead and had to be replaced by appellant.

From all the evidence bearing on this question, the jury may well have believed that the grape roots which respondents received and planted were of the same quality and condition as those which Mrs. Roberts and her husband received and planted. Moreover, Mrs. Roberts' testimony with reference to the appearance and condition of respondents' grape roots at the time they were trimmed and planted differed materially from other testimony in the case. Respondent Alex Bleyhl, who helped trim the roots, testified that they were placed in cold storage after Mr. Wyant had "said it would be all right" to do so. He further testified that, while there may have been some slight mildew on the roots, "they looked the same when they come out as when they went in, apparently." Respondent Carl Bleyhl testified that he saw the roots, or some of them, as they were being planted and that, so far as he knew, they did not have "any perceptible amount" of mold on them. Mr. Erickson testified that the roots were kept moist from the time they were hauled from the freight car until they were planted.

It is apparent from a reading of the record that the evidence was in conflict as to whether the respondents knew, or in the exercise of ordinary care should have known, that the roots were defective at the time they were received and planted by them. A question of fact was thus presented. The decision of that question was the duty and responsibility of the jury. The court correctly instructed the jury upon that issue, and, in our opinion, the finding of the jury thereon has ample support in the evidence.

Appellant's second contention, as expressed in its second assignment of error, is that:

"The court erred in holding it to be a jury question that respondents had given reasonable notice of their intention to claim damages for breach of warranty."

This contention is founded upon another section of the uniform sales act, Rem. Rev. Stat., § 5836-49 [P.P.C. § 854-33], which provides as follows:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer *fail to give notice* to the seller of the breach of any promise or warranty *within a reasonable time* after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor." (Italics ours.)

The second sentence of this section is the portion upon which appellant especially relies.

Appellant's contention is based upon the assumption that respondents knew, or in the exercise of ordinary care should have known, of the defective condition of the roots, constituting a breach of warranty, prior to the time the roots were planted, which was during the latter part of April; or, if not known then, it should, at the latest, have been known by respondents during the first week of June when the roots allegedly failed to produce satisfactory growth. Upon that assumption, appellant contends that, since it received no notice from respondents until October 3, 1946, some 115 or 155 days after respondents knew or should have known of the alleged breach, the trial court should have held, as a matter of law, that notice was not given within a reasonable time, and that consequently there was no question for consideration by the jury.

■■ As previously stated, the jury could have found, and manifestly did find, from the evidence and in light of the instructions given, that respondents did not know, and in the exercise of ordinary care were not bound to know, of the defective condition of the roots at the time of planting in May, 1946. Furthermore, the jury was also entitled to find from the evidence that respondents had no knowledge of the heated condition of the freight car until sometime during the month of July, and that therefore, until at least that time, they had no knowledge nor reason to believe that

the roots were defective, nor any occasion for giving notice of any defective condition.

When the respondents became dissatisfied with the progress of growth being made by their grape roots, which was sometime during the month of July, they requested the advice of Mr. Wyant, appellant's agent who had sold and delivered the roots to them. Wyant, after inspecting the premises and announcing that "it don't look very good," promised to send over a man, presumably to investigate the situation and advise respondents as to what should be done. That promise was never fulfilled. Apparently, Wyant never considered that the failure of the roots to grow was due to their initial defective condition, for there is nothing in the record indicating that he ever so advised the respondents; and it may readily be inferred from the record that, since Wyant did not entertain any belief that such was the cause, the respondents had no reason to believe otherwise.

One of the witnesses testified that some grape plants are slow in budding, and that some may leaf out in the latter part of July. Sometime during that month, respondents ceased to cultivate the tracts whereon the grape roots had been planted. Appellant makes no contention that, under the circumstances, cultivation should have continued.

After inquiry and investigation as to the cause of the failure of the roots to grow, respondents on October 3, 1946, notified appellant of its breach of warranty.

Upon this issue, covered by appellant's second assignment of error, there was a conflict in the evidence, making it a question for the jury to decide whether, under the circumstances shown, the notice given by respondents was within a reasonable time after knowledge by them of the defective condition of the roots.

What constitutes "notice within a reasonable time," as provided in Rem. Rev. Stat., § 5836-49, *supra,* is usually a mixed question of law and fact, dependent upon a variety of facts and circumstances of the particular case, and generally resolving itself into a question of fact to be determined by the jury, upon proper instructions by the court. *Baum v. Murray,* 23 Wn. (2d) 890, 162 P. (2d) 801.

The *Baum* case, *supra,* was an action to recover damages for illness alleged to have resulted from the consumption of pork sausage purchased by the plaintiffs from the defendant. The purchases were made on or about September 24, 1942. Some days after eating the sausage, plaintiffs became ill and required medical aid. The illness was diagnosed as trichinosis, a parasitic infection of the human body which may occur after eating pork. On January 15, 1943, an attorney representing the plaintiffs called on the defendant and informed her that he represented two families whose members had become ill from eating sausage purchased from the defendant, but the attorney did not at that time identify the persons whom he represented nor did he clearly indicate the date when the purchases were made. On January 18, 1943, the attorney and one of the plaintiffs called on the defendant for the purpose of enabling that plaintiff to identify the kind of sausage he had purchased. On one of the two visits above mentioned, the attorney informed the defendant that a suit for damages was contemplated. The suit was instituted on April 24, 1943.

The case was tried and decided on the theory of a breach of implied warranty of fitness of the sausage for human consumption. One of the principal questions involved on the appeal was whether the notice of breach of such warranty was given by the plaintiffs within a reasonable time, as required by Rem. Rev. Stat., § 5836-49. It will be observed that the time intervening between the date of purchase of the sausage, September 24, 1942, and the date of notice to the defendant of the breach of warranty, January 15, 1943, constituted a period of 113 days. On the question of reasonable time, this court said:

"As to what may be considered a reasonable time is usually a mixed question of law and fact. It depends upon such a variety of facts and circumstances in each particular case that it usually resolves itself into a question of fact to be determined by the jury upon proper instructions by the court. In some cases the undisputed factual situation may be such that the court can say as a matter of law whether a certain thing required was or was not done within a reasonable time. [Citing authorities.]

"Although it may be said that the facts as to when the notice was given are not in dispute, reasonable minds may well differ as to the conclusion to be drawn from them, and, that being the case, we would not be justified in holding as a matter of law that the notice either was or was not given within a reasonable time."

In the case at bar, the jury could well have found, and apparently did find, that respondents did not know, nor by the exercise of reasonable care were required to know, until, at the earliest, sometime in July, 1946, that the roots were defective. In that situation, the period elapsing between the date when respondents knew or were required to know of the defective condition of the roots and the date of giving notice amounted to not more than 95 days, which was considerably less than the time of alleged delay involved in the *Baum* case, *supra*.

The rule is explained in *Hesse v. Gude Bros.-Kieffer Co.,* 170 N. Y. S. 211, wherein the court said:

"There cannot in the nature of things be a simple or single question which depends for its solution partly on matter of law and partly on matter of fact. Reasonable time means what under the circumstances a reasonable, prudent man would do, and is always, it would seem, properly speaking a question of fact, with the usual proviso, however, that whether there is any evidence to support a finding of fact is a question of law, and this is doubtless all that is meant by the statement often found in the cases that the question of reasonable time is for the court."

In *Hazelton v. First Nat. Stores, Inc.,* 88 N. H. 409, 190 Atl. 280, the rule and its limitations are set forth in the following statement:

" 'But when salient facts are in controversy and depend in part upon inferences to be drawn by sound judgment, then it is a question of fact to be determined by the practical sense of a jury.' *American Steam Gauge &c. Co. v. Company,* 214 Mass. 299.

"The above quotations state with substantial accuracy the accepted practice in this jurisdiction with reference to questions of fact of a similar nature. The question of reasonable time, like the questions of proximate cause and negligence, 'is necessarily subject to the limitation affecting the submission of all questions of fact to the jury: that if

on the evidence reasonable men can come to only one conclusion, there is no question for their decision.' *McGill v. Company,* 70 N. H. 125, 129; *Gahagan v. Railroad,* 70 N. H. 441, 445; *Deschenes v. Railroad,* 69 N. H. 285."

Counsel have cited a number of cases involving the question of whether notice of breach of warranty was given in the particular case within a reasonable time. Cases involving this question are collected in an annotation appearing in 71 A. L. R. 1149, and are further cited in the Blue Books of decisions supplemental to this annotation, and also in the annotations appearing in vol. 1 Uniform Laws Annotated and Cumulative Annual Pocket Part supplementing it, covering § 49 of the uniform sales act.

Those cases hold that what constitutes a reasonable time within which to give notice to the seller of a breach of warranty is generally a question of fact for the jury, and only when the facts are undisputed and there is no room for different inferences does the question become one of law for the court.

In the case at bar, the time when notice was given by respondents is undisputed and certain, but the time when respondents knew, or should have known, the defective condition of the roots, was not only disputed and uncertain, but also by reason of the attendant circumstances presented a question upon which reasonable minds might well differ. It therefore became a question for the jury to decide. Upon the facts presented by the evidence, this court cannot say, as a matter of law, that notice was not given within a reasonable time.

■ Appellant's remaining assignments of error relate to two instructions given by the trial court. These assignments are not argued in the briefs, and they will therefore not be further considered. *Gephart v. Stout,* 11 Wn. (2d) 184, 118 P. (2d) 801; *McCoy v. Courtney, ante* p. 125, 190 P. (2d) 732.

The judgment of the trial court will be affirmed.

MALLERY, C. J., BEALS, JEFFERS, and SCHWELLENBACH, JJ., concur.