[No. 1610-2. Division Two. August 2, 1976.]

MARLIN E. TESTO, *Respondent*, v. RUSS DUNMIRE
OLDSMOBILE, INC., *Appellant*.

40

*Thomas G. Krilich* and *Lee, Krilich, Lowry & Thompson,* for appellant.

*Richard J. Dolack* and *Comfort, Dolack, Hansler, Hulscher, Rosenow, Burrows & Billett,* for respondent.

PETRIE, C.J.—Plaintiff, Marlin E. Testo, purchased a used automobile from defendant, Russ Dunmire Oldsmobile, Inc. When the vehicle failed to operate properly, plaintiff filed a "Complaint for Rescission" seeking, not only return of the purchase price, but also reasonable attorney's fees on the theory that defendant had engaged in an unfair or deceptive act in the conduct of trade in violation of the Washington Consumer Protection Act, RCW 19.86.

The defendant has appealed a judgment which ordered "rescission" and return of the purchase price of $2,697, and also awarded attorney's fees in the sum of $500. Insofar as appropriate to resolve the issues on appeal, the defendant contends (1) no implied warranty arises from the sale of a used car, (2) the defendant effectively disclaimed any implied warranties, (3) the plaintiff waived any implied warranties, (4) the defendant has not breached any warranties, (5) the plaintiff is not entitled to rescission of the contract, and (6) the defendant committed no unfair or deceptive act or practice in the conduct of trade. We affirm the judgment.

On October 25, 1973, Peter VanMondfrans traded his 1969 Camaro Z-28 for a new car at defendant's place of business. VanMondfrans informed the new-car salesman with whom he was dealing that he had used the Camaro for racing. The salesman did not pursue this information to ascertain the nature or extent of the racing. Nor did he record it or communicate it to any other of defendant's agents.

On the following day, the plaintiff and his wife spotted the Camaro on defendant's used-car lot. They had been looking for this type of make and model, so they stopped to inquire as to its availablility. By trade, plaintiff is a sheet metal worker, and he has a specialty rating in the Washington Army National Guard as a mechanic. He took the vehicle for a test drive during which it exhibited no signs of malfunctioning. Although the automobile was obviously equipped with wide tires, rear spoiler, and a powerful engine, there was nothing about its appearance or performance that would indicate to plaintiff, even though he was familiar with high performance cars, that this particular one contained approximately $6,000 worth of racing modifications and, in fact had been raced on the average of twice a month for a period of 3 years. Unaware of these facts, plaintiff agreed to purchase the vehicle for $2,697.

Within 3 hours after plaintiff took delivery, he experienced trouble starting the engine. It would overheat and quit; then would not restart until after it cooled down. On the following day, plaintiff replaced the starter and battery himself in a futile attempt to end the malady. Also on this day, he contacted the defendant dealership to ascertain the name of the vehicle's former owner. During his subsequent conversation with VanMondfrans, plaintiff first learned the Camaro had been extensively modified and raced. Specifically, the engine had been "rebuilt" on two occasions, a racing-type transmission had been installed, the rear axle assembly had been changed, and the starter, flywheel, and clutch had each been replaced. Thinking he might be able to remedy the vehicle's problems on his own, plaintiff did

not complain to defendant about these newly discovered facts. After 5 more days of continual trouble, however, Testo towed the vehicle to defendant's service shop. Defendant's employees performed some work on the vehicle's starter, the engine was started and, in the words of defendant's used-car manager, "[E]very bearing in the engine was knocking, . . ." Plaintiff thereupon requested that the vehicle be placed in running order. Defendant offered to pay 50 percent of the cost of repairs rather than the 15 percent provided for in its written warranty. Plaintiff refused this offer and towed the car back to his home where it sat undriven at least until commencement of the present suit.

Within a week after the car had been towed back home, a friend of plaintiff suggested removing the oil pan to check the oil pump, which he suspected was not operating. This inspection revealed that the oil pump was not functioning due to the improper fit of the housing on the substituted transmission. The transmission was forcing the flywheel and crankshaft forward, which in turn caused inordinate pressure and wear of the rear main crankshaft bearing. These defective conditions were evidenced by the presence of metal shavings in the bottom of the oil pan and in the oil pump itself. Soon after this discovery, plaintiff, through his attorney, formally requested rescission of the contract and restitution of the purchase price. Upon defendant's refusal, plaintiff commenced this lawsuit.

### THE IMPLIED WARRANTY OF MERCHANTABILITY IN THE SALE OF USED GOODS

The defendant dealership contends there is no implied warranty in the sale of used or secondhand articles. *See, e.g., Fairbanks Steam Shovel Co. v. Holt & Jeffery*, 79 Wash. 361, 140 P. 394 (1914); *Warren v. W.W. Sheane Auto Co.*, 118 Wash. 213, 203 P. 372 (1922). These early cases were decided long before adoption in this state of the Uniform Commercial Code (RCW Title 62A).

The sale of goods in the case at bench is governed by the

provisions of RCW 62A.2. Specifically, RCW 62A.2-314(1) provides in part:

> Unless excluded or modified (RCW 62A.2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

■ Further, there is no question the defendant was a "merchant" under the provisions of RCW 62A.2-104. Hence, an implied warranty of merchantability attaches to the sale. The code does not distinguish between new and used goods, the sale of which gives rise to implied warranties. We hold that "unless excluded or modified" a warranty of merchantability arises in the sale of a used automobile. *Accord, Rose v. Epley Motor Sales*, 288 N.C. 53, 215 S.E.2d 573 (1975); *Overland Bond & Inv. Corp. v. Howard*, 9 Ill. App. 3d 348, 292 N.E.2d 168 (1972); *Chamberlain v. Bob Matick Chevrolet, Inc.*, 4 Conn. C.C.R. 685, 239 A.2d 42 (1967); *Regula v. Gerber*, 47 Ohio L. Abs. 196, 70 N.E.2d 662 (C.P. Tuscarawa County 1946).

What does the term "merchantable" mean with respect to a used car? RCW 62A.2-314(2) provides a list of minimum standards intended to aid in this term's interpretation. "Merchantable" means that goods must be at least such as:

> (a) pass without objection in the trade under the contract description; and

> . . .

> (c) are fit for the ordinary purposes for which such goods are used; . . .

■ The comments to the code are helpful in revealing the intent of the code's original drafters. Particularly, Official Comment 3, RCWA 62A.2-314 states in part:

> A contract for the sale of second-hand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description.

The obligation appropriate to the sale of used goods is primarily directed at the operative essentials of the product. *Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J. Super. 441,

240 A.2d 195, 204 (1968). Thus, the measure of a used car's merchantability turns not so much on aesthetic items which, of necessity, must yield to age and previous use, *Chamberlain v. Bob Matick Chevrolet, Inc., supra,* but on its operative qualities. The price at which a merchant is willing to sell an item is an excellent index of the extent of quality warranted and the nature and scope of his obligation. Official Comment 7, RCWA 62A.2-314. To be fit for the purpose of ordinary driving, a 4-year-old automobile, selling for $2,697 in 1973, must be in reasonably safe condition and substantially free of defects which render it inoperable. It also must be a "used car" and not a vehicle substantially modified for racing purposes and extensively used as such.

In the case at bench, the evidence indicates that the plaintiff drove the vehicle 138 miles in a normal and proper manner; that 3 hours after the sale, it exhibited overheating and starting problems; that the car was rendered undrivable due to internal engine damage, the result of prior racing or race-related modifications; and that the vehicle was not an ordinary car, but a "race car" requiring unusual care to maintain its operation. It is reasonable to infer from these facts that the vehicle (1) was not able to provide simple transportation due to defects present at the time of sale and (2) did not meet the contract description of "used car." When the vehicle was sold, it simply was not "merchantable" within the meaning of RCW 62A.2-314(2).

### WAIVER AND DISCLAIMER OF IMPLIED WARRANTY

We turn now to defendant's secondary argument—that if an implied warranty of merchantability did arise in the sale of this automobile, as we have declared it did, then that warranty was excluded by (a) plaintiff's inspection of the vehicle, and (b) certain contract disclaimers.

RCW 62A.2-316(3)(b) provides that:

(b) when the buyer before entering into the contract has examined the goods . . . as fully as he desired . . . *there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him;* . . .

(Italics ours.) Although the evidence shows the plaintiff

test drove the automobile and looked it over before making the purchase, nothing in the evidence would compel a finding that the defects which soon rendered the vehicle inoperable and unacceptable should have been discovered by him through normal test driving and inspection. Plaintiff was aware of the factory-installed high performance qualities of a Camaro Z-28, but it is unreasonable to require of a used-car buyer, even one with Mr. Testo's mechanical aptitude, that he be held to knowledge of substantial mechanical adaptations and modifications to accommodate extensive racing activity. We hold that the plaintiff did not waive any implied warranty of merchantability.

Defendant attempts to bring itself within the provisions of RCW 62A.2-316(2) and (3)(a), which respectively state:

> (2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, . . .
> (3) Notwithstanding subsection (2)
> (a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; . . .

The evidence establishes that before taking actual delivery, plaintiff signed two documents. The first, denominated "purchase order," was signed contemporaneously with payment. It contained the following provision:

> 9. ANY USED VEHICLE SOLD TO PURCHASER BY DEALER UNDER THIS ORDER IS SOLD AT THE TIME OF DELIVERY BY SELLER WITHOUT ANY GUARANTY OR WARRANTY, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY . . .

After plaintiff paid his money and the used-car sales manager approved the terms of purchase, plaintiff was handed a card entitled "G W Agreement" (General Warranty Agreement). It provided for a 15 percent discount on

necessary parts and labor for a period of 2 years, but otherwise the vehicle was sold "as is."

At trial, the used-car salesman who negotiated the sale was asked: "Prior to the time that the papers were signed, . . . was there a discussion . . . regarding what warrantee, if any, was to be carried on this car?" He responded: "Not until actually the sale was closed." Plaintiff and his wife both testified that defendant's used-car salesman did not mention warranties until after they had paid the purchase price and then there was only a momentary reference to the 15 percent discount.

■ In disposing of this issue of the effectiveness of defendant's attempted disclaimer, we start with the established rule that printed disclaimers of warranties in form contracts are not favored by the courts and should be strictly construed against the seller. *Berg v. Stromme*, 79 Wn.2d 184, 484 P.2d 380 (1971). Although a general disclaimer clause may negate implied warranties if there is a negotiated contract between a commercial seller and a commercial buyer, it is not appropriate to a consumer sale. This is so unless it is shown that the so-called disclaimer was *"explicitly negotiated* between buyer and seller *and set forth with particularity* showing the particular qualities and characteristics of fitness which are being waived." (Italics ours.) *Berg v. Stromme, supra* at 196.

There is no evidence that prior to sale the parties discussed, let alone negotiated, the issue of disclaimers. The only reference to the subject was limited to the provision of the G W Agreement which *granted* a 15 percent discount. The purported effect of the disclaimer—to *take away* all warranties and limit any potential remedies—was never brought to the plaintiff's attention. We cannot say, therefore, that plaintiff and defendant "explicitly negotiated" the terms of the disclaimer clauses.

Likewise, it cannot be said that the buyer understood "with particularity" what defects and conditions he was supposedly waiving when it is clear that he did not even

know the true character of the commodity he was purchasing.

The rule enunciated in *Berg* has not been altered by adoption of the code, *see Dobias v. Western Farmers Ass'n,* 6 Wn. App. 194, 491 P.2d 1346 (1971); *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 544 P.2d 20 (1975), and it applies with equal force to the sale of used as well as new automobiles.

Therefore, we hold that the attempted disclaimers were insufficient to relieve Russ Dunmire Oldsmobile, Inc., of liability for breach of implied warranty of merchantability.

RESCISSION AND REVOCATION OF ACCEPTANCE

What remedies are available to plaintiff for breach of implied warranty of merchantability? The answer to this question requires consideration of the code's concept of rejection, acceptance, and revocation of acceptance.

The code provides that if the goods sold fail in any respect to conform to the contract, the buyer may *reject* them within a reasonable time after their delivery, provided he seasonably so notifies the seller. RCW 62A.2-601 and -602. "Acceptance of goods by the buyer precludes rejection of the goods accepted . . ." RCW 62A.2-607. Under RCW 62A.2-606(1) buyer has *accepted* if he has done any of the acts described therein, including: "(c) does any act inconsistent with the seller's ownership; . . ." By taking possession of the vehicle, paying for it, using it for nearly a week, and attempting to repair it, the plaintiff has acted in a manner "inconsistent with the seller's ownership" and thus is deemed to have "accepted" the goods.

Defendant contends that "a buyer is not entitled to rescission for nonconformity after acceptance." The code plainly provides to the contrary although it does not speak of "rescission," as such in this context. We need not now decide whether judicial rescission of a contract is a pre-code concept of law or equity which survives under and as a supplement to the code within the meaning of RCW 62A.1-103. *See DeCoria v. Red's Trailer Mart, Inc.,* 5 Wn. App. 892, 491 P.2d 241 (1971).

■ We view plaintiff's plea for "rescission" as an allegation of "revocation of acceptance" because that code concept more nearly reflects the claim asserted by the plaintiff. 2 R. Anderson, *Uniform Commercial Code* § 2-711:19, at 420 (2d ed. 1971). *See Lanners v. Whitney*, 247 Ore. 223, 428 P.2d 398 (1967); *Lawner v. Engelbach*, 433 Pa. 311, 249 A.2d 295 (1969). The buyer who has accepted goods as performance of the seller's contract may *revoke his acceptance* when there is a nonconformity of the goods to the contract which substantially impairs their value to him, provided his failure to discover such nonconformity prior to his acceptance of the goods was reasonably induced by the difficulty of such discovery and he notifies the seller of such revocation within a reasonable time after he discovers, or should have discovered, the ground therefor and before any substantial change in condition of the goods not caused by their own defects. RCW 62A.2-608. When the buyer justifiably revokes his acceptance of the goods, he may cancel the sale and recover the purchase price together with such other damages as may be justified. RCW 62A.2-608(3) and -711.

We have already determined that defendant breached its implied warranty of merchantability. While it is not every breach of warranty which will substantially impair a commodity's value in the eyes of its buyer, surely in the case at bench, had plaintiff known of the defects in the automobile, it would have lost not only its real value in his eyes, but it would have become an instrument whose integrity was substantially impaired and whose operation was fraught with apprehension. *See Zabriskie Chevrolet, Inc. v. Smith, supra.*

### TIMELINESS OF REVOCATION OF ACCEPTANCE

This brings us to another portion of defendant's attack on the trial court's decision: Buyer did not notify defendant of his intention to "rescind" when he learned that the vehicle had been modified and raced. RCW 62A.2-608(2) declares:

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have

discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

The results of the vehicle having been substantially modified and raced were not apparent until development of the bearing knock and subsequent inspection of internal parts. When plaintiff first was put on notice of the vehicle's defects, he refused to permit defendant to make repairs at a 50 percent cost to him. Any conduct clearly manifesting the buyer's desire to get his money back is a sufficient notice to revoke. "A tender of the goods by the buyer to the seller is not an essential element of a revocation of acceptance." 2 R. Anderson, *Uniform Commercial Code* § 2-608:18, at 246 (2d ed. 1971).

[I]t has been held that a purchaser's refusal to permit the seller to make repairs may be sufficient notice of rescission. . . . Furthermore, the commencement of suit to reclaim the purchase price is also sufficient notice of rescission.

*Fenton v. Contemporary Dev. Co.*, 12 Wn. App. 345, 349, 529 P.2d 883 (1974).

The record in this case clearly supports the correctness of the trial court's conclusion that the buyer's revocation was timely and otherwise appropriate.

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

Finally, we examine the contention that the trial court erred in concluding the defendant committed a deceptive act as proscribed by RCW 19.86.020 of the Washington Consumer Protection Act, which provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

In its oral opinion, the trial court, as finder of fact, resolved the conflicting evidence as establishing that: (1) plaintiff was not familiar with racing vehicles, although he had some background in mechanics; (2) plaintiff and his wife did not desire to purchase a race car; (3) the new-car

salesman who was informed of the vehicle's race-car status failed to communicate this fact to any other of defendant's agents; (4) the used-car salesman who sold the vehicle to plaintiff thought it was a race car as evidenced by the transmission modification; (5) it was obvious to the used-car sales manager, who appraised the automobile, that the car had been raced although no one had told him so; and (6) none of defendant's agents communicated their knowledge to plaintiff. This interpretation of the evidence clearly supports the significant portions of the following challenged findings of fact:

▇ Plaintiff had limited experience in auto mechanics. Neither the plaintiff nor his wife wanted to buy a racing vehicle; they wished to buy an automobile for transportation.

▇ This was not an ordinary vehicle; it was an unusual car; the characteristics were within the knowledge of the seller and not within the knowledge of the buyer and none of these characteristics were made known to the buyer by the seller.

▇ The high performance car takes a special maintenance and this advice was not imparted to the plaintiff. The parties were not on an equal footing with respect to the unusual characteristics within the knowledge of the seller.

The defendant argues that, even assuming these findings to be correct, a claim for relief under RCW 19.86.020 must be supported by proof of misrepresentation. We do not agree.

The courts of this state are specifically directed to "be guided by" federal court interpretations of those various federal statutes after which our Consumer Protection Act is patterned. RCW 19.86.920. In *Tradewell Stores, Inc. v. T. B. & M., Inc.*, 7 Wn. App. 424, 500 P.2d 1290 (1972) we examined cases arising under the Federal Trade Commission Act, 15 U.S.C.A. § 45 (1963),[1] and concluded at page 431.

Proof of intention to deceive is not a prerequisite to

[1] 15 U.S.C.A. § 45(a)(1) (1976) provides:
"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

finding a violation under the FTCA. *See Regina Corp. v. Federal Trade Comm'n*, 322 F. 2d 765 (3d Cir. 1963). Thus, defendant's good faith is irrelevant in a determination of whether a deceptive or unfair practice exists.

Whether a plaintiff-consumer has been actually deceived is irrelevant. Rather, if he can show that the defendant's actions possessed a tendency or capacity to mislead, an unfair or deceptive act is proved. *Vacu-Matic Carburetor Co. v. Federal Trade Comm'n*, 157 F.2d 711 (7th Cir. 1946). *See generally* Comment, *Toward Effective Consumer Law Enforcement: The Capacity to Deceive Test Applied to Private Actions*, 10 Gonzaga L. Rev. 457 (1975). Clearly, trade law has developed along lines intended to eliminate the "gamesmanship" formerly attendant to the tradition of caveat emptor and in so doing has helped equalize the bargaining position of consumers.

In the case at bench, we are confronted by a defendant who is in the business of selling new and used cars to the public, whose agents either knew or assumed that a recently acquired used Camaro was more than a high-performance automobile but was in fact a "race car," and who, in negotiating the sale of this car, never disclosed this information to plaintiff.

A buyer and seller do not deal from equal bargaining positions when the latter has within his knowledge a material fact which, if communicated to the buyer, will render the goods unacceptable or, at least, substantially less desirable. Failure to reveal a fact which the seller is in good faith bound to disclose may generally be classified as an unfair or deceptive act due to its inherent capacity to deceive and, in some cases, will even rise to the level of fraud. *See Ikeda v. Curtis*, 43 Wn.2d 449, 261 P.2d 684 (1953); *Goldfarb v. Dietz*, 8 Wn. App. 464, 506 P.2d 1322 (1973).

The declared purpose of the Consumer Protection Act is to compliment the federal trade laws in order to protect the public and foster fair and honest competition, and to that end the act must be liberally construed. RCW 19.86.920. Pursuant to this mandate, we hold that the defendant's act

of withholding facts material to the sale of one of its used automobiles was a deceptive act under RCW 19.86.020.[2]

## Postscript

We deem it appropriate to address briefly an issue not dealt with by either of the parties, but which arises because of a recent opinion of the Washington State Supreme Court. In *Lightfoot v. MacDonald*, 86 Wn.2d 331, 544 P.2d 88 (1976), the court was asked to find an attorney in violation of the Washington Consumer Protection Act for an alleged breach of his private contract with the plaintiff-client. In affirming the trial court's judgment for defendant, the court stated at page 334:

> [A]n act or practice of which a private individual may complain must be one which also would be vulnerable to a complaint by the Attorney General under the act. *A breach of a private contract affecting no one but the parties to the contract*, whether that breach be negligent or intentional, *is not an act or practice affecting the public interest.*

(Italics ours.)

Our reading of this case convinces us that the court did not intend to limit private consumer protection actions to only those situations where defendant's actions cause actual injury to numerous consumers. The court did not place such a constrictive interpretation on the act, nor do we.

■ The plaintiff in the present case, Mr. Testo, as a member of the consumer public, *was influenced to make a purchase and enter into* a private contract by the deceptive act of the defendant. Had there existed no deception in the first instance, *i.e.*, had plaintiff's purchase been the result of a fully informed choice, his remedy for any subsequent

---

[2]We note in passing that although the trial court denominated defendant's acts as "deceptive" only, its conclusion that defendant violated RCW 19.86.020 could have been supported by a finding of "unfairness." For a comprehensive analysis of what is meant by the term "unfair" see W. Erxleben, *The FTC's Kaleidoscopic Unfairness Statute: Section 5*, 10 Gonzaga L. Rev. 333 (1975).

breach of contract would lie under the Uniform Commercial Code or some other common-law contract doctrine.

Judgment affirmed.

PEARSON and REED, JJ., concur.