Howard WORTHEY et al.,
Plaintiffs-Appellants,

v.

SPECIALTY FOAM PRODUCTS, INC.,
Defendant-Respondent.

No. 10880.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 6, 1979.

Motion for Rehearing and for Transfer
Denied Nov. 29, 1979.

Application to Transfer Denied
Jan. 15, 1980.

Arch M. Skelton, Ted Von Willer, Jr., Springfield, for plaintiffs-appellants.

William A. Wear, Sr., William A. Wear, Jr., Blythe Crist-Brown, Wear & Wear, Springfield, for defendant-respondent.

BILLINGS, Presiding Judge.

The pivotal issue in this appeal is whether or not the implied warranty of merchantability, created by the Uniform Commercial Code [Chapter 400, RSMo 1969], applies to the sale of used goods. In a bench trial the trial court concluded that the plaintiffs' sale of a used truck to defendant was governed by the Code. The trial court found against plaintiffs on their petition for the purchase price of the truck and entered judgment for defendant on its counterclaim for damages. We affirm.

Plaintiffs are in the used truck sales business in Springfield, Missouri. Defendant fabricates various polyurethane products at Ozark, Missouri, and began its operation in September 1976.

On November 10, 1976, Morris Dock and James Grundy, defendant's president and vice president, went to the plaintiffs' used truck lot in search of a truck. They informed Richard Wilson, a salesman for plaintiffs, of the business they were in and the purpose for which they were seeking to buy a truck. Wilson showed them a 1969 Ford truck with a twenty-two foot bed and dual axle, which he said was a "good old truck". After looking at the engine and giving the truck a test drive, Dock and Grundy decided to buy the truck, at the $4,500 price quoted by Wilson, if the plaintiffs would agree to replace two of the truck's tires, fix the speedometer, and install a stereo system. Wilson agreed to these requests, and on November 12, 1976, Dock and Grundy picked up the truck and gave the plaintiffs a company check for the purchase price. Dock drove the truck to a shop, which installed the stereo system, and then to a service station. After having the truck serviced at the station, Dock drove the truck to his house where it stayed overnight. The next day, the truck was driven to the defendant's plant where it remained idle until November 15, 1976.

On November 15, 1976, the truck was used twice. During each use, the electric tailgate lift was used without the engine running and as a result, the engine failed to start after each use. After the second use and failure of the engine to start, Wilson was called to help start the truck. The truck was started with "jumper cables" and was then driven to the plaintiffs' garage, where Wilson conducted a preliminary check of everything, including the battery and electrical system, and the oil level. Dock picked up the truck at midnight and drove it back to his house.

On November 16, 1976, Dock and Bob Woodworth, defendant's treasurer, left in the truck for a trip to St. Louis. Both Dock and Woodworth drove the truck en route to St. Louis and both testified that the truck was driven in the high range axle at all times during this trip and below the 55 mph speed limit. Dock drove the truck from Springfield until they reached a service station ten miles west of Lebanon, Missouri. Woodworth then drove the truck from this stop to their next stop between St. James and Rolla, Missouri. At both stops, the oil level was checked by Dock or an attendant, with a quart of oil being added at the second stop. Dock drove from the second stop to a point near Valley Park, Missouri, where a "clatter within the motor" caused Dock to pull off the highway. The engine was turned off and would not re-start. While Woodworth walked to a service station to get a tow truck, Dock checked the oil level and found it to be full.

The tow truck arrived and towed the truck to Brockway, a truck repair facility just west of St. Louis, Missouri. The engine was started, with the assistance of jumper cables, but was turned off because of a loud clatter. James Platter, Brockway service manager, testified that after the crankcase had been dropped and one or two rods pulled, he looked at the parts and determined it had damaged bearings and a bad crankshaft. He further testified that the truck could not be run in its present condition, and in order to determine the exact cause of the breakdown would require the engine to be pulled out, the head pulled from it, and the crankshaft pulled out.

Dock and Woodworth left the truck at Brockway. Dock called Wilson and advised him that the truck had broken down, and was "in St. Louis at a place named Brockway", and that payment on defendant's check would be stopped.

In this action, plaintiffs brought suit for the purchase price of the truck. Defendant, by way of answer and counterclaim, alleged that plaintiffs had breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose under § 400.2–314[1] and § 400.2–315.[2] In support of the trial court's ruling, that the sale of the used truck was governed by the Uniform Commercial Code and an implied warranty of merchantability arose, defendant reviews the Code provisions which it deems applicable and cites a host of cases from other jurisdictions that have ruled that the sale of second-hand goods is subject to implied warranties under the Code, including the implied warranty of merchantability as contained in § 400.2–314.

Plaintiffs contend that no implied warranty of merchantability arises in the sale of used or second-hand goods and that the instant sale is governed by pre-code law. We are referred to pre-code Missouri decisions by plaintiffs in support of their conclusion that, absent a statement of fact by a seller, or proof of fraud, there are no implied warranties for used goods. By way of further support, plaintiffs point to the holding in *Chaq Oil Company v. Gardner Machinery Corporation*, 500 S.W.2d 877 (Tex. Civ.App.1973), which ruled the Texas Business and Commercial Code § 2.314 [identical to our § 400.2–314] did not create an implied warrant of merchantability in the sale of second-hand goods and that Texas pre-code law governed.[3]

---

1. References to statutes are to Missouri Revised Statutes, 1969.

2. In view of our conclusion that the sale of the used truck gave rise to an implied warranty of merchantability, we do not deem it necessary to review the trial court's determination that no implied warranty of fitness for a particular purpose arose in this sale.

3. In *Moore v. Burt Chevrolet, Inc.*, 563 P.2d 369 (Colo.App.1977), the seller of a used truck argued that pre-code decisions controlled, citing *Chaq Oil*. In holding that pre-code decisions were inapplicable and that the UCC governed, the court noted the seller's reliance on *Chaq Oil* and said: "Our research reveals, however, that Texas is the only jurisdiction to hold the UCC inapplicable to used goods. That holding has been severely criticized, Note, UCC Implied Warranty of Merchantability and Used Goods, 26 Baylor L.Rev. 630 (1974), and we find it unpersuasive." 563 P.2d at 370.

■ Our review of this court tried case is governed by Rule 73.01, V.A.M.R., as delineated by our Supreme Court in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Thus, the judgment is to be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Initially, we observe that, prior to the adoption of the Uniform Commercial Code of Missouri, the law concerning implied warranties in the sale of new or used goods was somewhat unclear and riddled with confusing distinctions. The late Professor Lee-Carl Overstreet pointedly observed this in "Some Aspects of Implied Warranties in the Supreme Court of Missouri", 10 Mo.L. Rev. 147 (1945), and noted that Missouri was one of the few jurisdictions which had not enacted the Uniform Sales Act despite efforts by the Missouri Bar for its adoption.

In 1963 Missouri adopted the Uniform Commercial Code, including Article 2 on Sales. The Code calls for a liberal construction of its terms and seeks, inter alia, uniformity in commercial transactions among the various jurisdictions [§ 400.1–102]. It makes substantial changes in the law of sales, and seeks to revise and modernize the law of sales as it existed under the Uniform Sales Act [4] [Comments, § 400.2–101]. The scope of the Code's Article on sales is set forth in § 400.2–102 and provides for its application to transactions in goods. "Goods" are defined by § 400.2–105 to mean "*all things* . . . which are movable at the time of identification to the contract for sale . . . ." (Emphasis added). Neither § 400.2–102 nor § 400.2–105 distinguish between transactions involving new or used goods.

Under the Code, § 400.2–314 is the statute that creates an implied warranty of merchantability. It states, in part, as follows:

"(1) Unless excluded or modified [§ 400.-2–316], a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

. . .

(c) are fit for the ordinary purposes for which such goods are used; . . . ."

The Code Comment to this statute states: "A contract for the sale of second-hand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description."

■ We are of the opinion that the sale of used or second-hand goods is covered by the provisions found in § 400.2–102, § 400.2–105, and § 400.2–314 and carries an implied warranty of merchantability. If the framers of the Code had intended to exclude used or second-hand goods from any implied warranties, merchantability or otherwise, they could have easily done so. As the court in *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wash.App. 39, 554 P.2d 349 (1976) stated: "The Code does not distinguish between new and used goods, the sale of which gives rise to implied warranties. We hold that 'unless excluded or modified' a warranty of merchantability arises in the sale of a used automobile". We agree with *Testo* and the overwhelming weight of authority from other jurisdictions that have interpreted and applied similar or identical Uniform Commercial Code provisions to the sale of used or second-hand cars and trucks. See, e. g., *Moore v. Burt Chevrolet, Inc.,* 563 P.2d 369 (Colo.App.1977)

4. The Uniform Sales Act created various implied warranties that were held applicable to the sale of used cars. *Wallower v. Elder,* 126 Colo. 109, 247 P.2d 682 (1952); *Regula v. Gerber,* Com.Pl., 70 N.E.2d 662, 34 Ohio Op. 206 (1946). As stated in *Natale v. Martin Volks-* *wagen, Inc.,* 92 Misc.2d 1046, 402 N.Y.S.2d 156 (1978), "The Uniform Sales Act, which was replaced by the Uniform Commercial Code, was interpreted by courts to apply to second-hand goods."

(used truck); *Roupp v. Acor,* 253 Pa.Super. 46, 384 A.2d 968 (1978) (used truck); *Rose v. Epley Motor Sales,* 288 N.C. 53, 215 S.E.2d 573 (1975) (used car); *Overland Bond and Investment Corp. v. Howard,* 9 Ill.App.3d 348, 292 N.E.2d 168 (1972) (used car); *Stream v. Sportscar Salon, LTD.,* 91 Misc.2d 99, 397 N.Y.S.2d 677 (1977) (used car); and *Natale v. Martin Volkswagen, Inc.,* 92 Misc.2d 1046, 402 N.Y.S.2d 156 (1978) (used car).

Plaintiffs next assignment of error is that the trial court erred in determining that plaintiffs had breached an implied warranty of merchantability under § 400.2–314 because there was no evidence that the truck engine failed because of a specific defect in the truck or engine when it was sold to defendant, or that this specific defect caused the engine to quit. Plaintiffs assert that, absent such evidence, defendant has failed to establish a breach of the implied warranty of merchantability under § 400.2–314.

Code Comment 13, to § 400.2–314, reads: "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." After establishing the existence of this warranty, it was incumbent upon the defendant in this case to show; (1) that the implied warranty of merchantability had been broken, and (2) that the breach of this warranty was the proximate cause of its loss.

Crucial to the issue of whether or not a seller has breached an implied warranty of merchantability, is the determination of whether or not the goods in question are merchantable. § 400.2–314(2)(c) contains the following pertinent language:

"(2) Goods to be merchantable must be at least such as . . .

(c) are fit for the ordinary purposes for which such goods are used; . . . .."

■ Plaintiffs argue that to establish that § 400.2–314 had been breached would require evidence that a specific defect existed in the goods at the time of their sale and that such defect caused the goods to be unmerchantable. A similar argument was made and rejected in *Burrus v. Itek Corp.,* 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168 (1977). In *Burrus,* the buyer of a printing press sued for the breach of an implied warranty of merchantability. The seller's defense to this action was based primarily on improper maintenance and operation of the press. Of significance, the court stated:

"The defendant, while citing no authority, nevertheless argues strongly that specific defects such as were in the press and which caused the poor operation of the machine must be proven by expert testimony. With this contention we disagree for no mention of specific defects is found in the test of a breach of implied warranty of merchantability in our Commercial Code. See Ill.Rev.Stat.1975, ch. 26, par. 2–314(2)(c)." 4 Ill.Dec. at 796, 360 N.E.2d at 1171.

The issue, therefore, is not whether a specific defect caused the breach of this warranty, but, rather, whether or not the seller has sold goods that were not merchantable. The defendant in this case had the burden to produce substantial evidence that the used truck was not merchantable. The showing of specific defects in goods is obviously one way in which a buyer can establish that a seller has sold goods that are not merchantable and thus, breached this implied warranty. This, however, is not the only way in which a buyer may show a breach of this implied warranty. Circumstantial evidence may also be used. See, e. g., *Jacobson v. Broadway Motors, Inc.,* 430 S.W.2d 602 (Mo.App.1968); *Williams v. Steuart Motor Company,* 161 U.S. App.D.C. 155, 494 F.2d 1074 (D.C. Cir. 1974); *Roupp,* supra; *Rose,* supra; and *Overland Bond and Investment Corp.,* supra; *Burrus,* supra; *Stream,* supra.

■ Here, defendant introduced evidence that the truck had been properly operated and maintained after it was purchased and that after driving the truck for only a few hundred miles it stopped running and was

no longer fit for the purpose for which it was bought. Plaintiffs introduced no testimony that conflicted with the defendant's evidence of proper maintenance and operation of the truck. This circumstantial evidence, even though it relates solely to subsequent transaction events, constitutes substantial evidence sufficient to support the trial court's judgment that the plaintiffs breached the implied warranty of merchantability under § 400.2–314 and that the breach of this warranty was the proximate cause of the loss sustained by the defendant. Plaintiffs' point is denied.

Plaintiffs next contend the trial court erred in finding that the defendant had effectively revoked acceptance of the truck, pursuant to § 400.2–608 because: (1) the defendant maintained a mortgage on the truck in connection with a general business loan; (2) defendant failed to disclose the exact whereabouts of the truck until January 20, 1977; and (3) defendant has "failed to ever offer to make the truck available to plaintiffs either at plaintiffs' place of business or defendant's place of business . . . ."

Section 400.2–608 states:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

Pursuant to § 400.2–608(3), § 400.2–602 and § 400.2–604 are the applicable sections for the buyer's duties to goods, subsequent to a revocation of acceptance.

Section 400.2–602 provides:

"(2) Subject to the provisions of the two following sections on rejected goods (sections 400.2–603 and 400.2–604),

(a) after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and

(b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest under the provisions of this Article (subsection (3) of section 400.2–711), he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

(c) the buyer has no further obligations with regard to goods rightfully rejected."

Section 400.2–604 states:

"Subject to the provisions of section 400.2–603 on perishables if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in section 400.2–603. Such action is not acceptance or conversion."

Plaintiffs maintain that defendant violated § 400.2–602(2)(a) and as such, cancelled an otherwise valid revocation of acceptance. We disagree.

■ Defendant introduced substantial evidence that the use of the truck by the defendant was in accord with § 400.2–602 and § 400.2–604. The defendant introduced testimony that its president had informed plaintiffs of the whereabouts of the truck and that payment on its check was being stopped on November 16, 1976, the day of the truck's breakdown; defendant sent plaintiffs a statement of revocation of ac-

ceptance; defendant stored the truck for the seller in a facility that regularly maintains such goods; defendant did not attempt to use the truck in any aspect of its business subsequent to notice of revocation; and, defendant has never refused a request by the seller to execute any and all papers necessary for the return of this truck. We hold that the trial court did not err in finding that defendant had effectively revoked acceptance of the truck.

The plaintiffs final assignment of error is that the trial court erred in awarding seven hundred dollars in consequential damages to the defendant, pursuant to § 400.2–715(2). This section provides:

"(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and . . . ."

Code Comment 3, to this section states: ". . . [T]he seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting. It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.

Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge.

Any seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy."

Code Comment 4 to § 400.2–715 states:

"The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which re-

quires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances."

Defendant introduced testimony that plaintiffs were informed of the business of the defendant and that the truck was needed to haul equipment to set up the defendant's business and then to transport merchandise to its customers. There was evidence as to defendants' expense of having to rent a substitute truck, paying useless license fees and taxes for this truck, and hauling expenses with U–Haul and Ozark Transfer.

We find that the defendant introduced substantial evidence to support the trial court's award of $700 for consequential damages to the defendant.

The judgment is affirmed.

All concur.