[No. 40541-1-I.   Division One.   September 28, 1998.]

MARK GRIFFITH, ET AL., *Appellants*, v. CENTEX REAL ESTATE CORPORATION, *Respondent*.

---

204

*Lynn L. Sarko* and *Mark A. Griffin* of *Keller Rohrback*, for appellants.

*Larry J. Smith* and *David C. Lundsgaard* of *Graham & Dunn*, for respondent.

ELLINGTON, J. — Mark Griffith, Renee Griggs, Eugene Zielke, Julia Metcalf, and 162 other individuals (the Class) purchased homes from builder-vendor Centex Real Estate Corporation (Centex). After the paint began to peel off the cedar siding on their homes, they sued Centex, alleging breach of express warranty, negligent misrepresentation, and violations of the Consumer Protection Act (CPA). The trial court certified a class action, and later granted summary judgment dismissing its claims. Because the contract warranty had expired and the negligent misrepresentation claim is barred by the economic loss rule, we affirm dismissal of those claims. We conclude, however, that a genuine issue of material fact exists under the Consumer Protection Act and therefore remand for further proceedings.

## Facts

Centex, a national "builder-vendor," marketed its homes to first-time home buyers, emphasizing reliance on the builder and promising quality homes. Centex showed the buyers model homes and provided brochures describing the homes and discussing Centex's warranty and commitment to customer satisfaction. Based upon this information, Class members contracted with Centex to purchase new, cedar-sided homes.

The Real Estate Contract provided for a one-year Builder Limited Warranty:

> [Centex] shall provide its standard Builder Limited Warranty covering defects in materials and workmanship in the Property for a period of one year as described in the Builder Limited Warranty documents. Copies of the Builder Limited Warranty are available for Purchasers' review in the Sales Office and a copy will be provided to Purchasers at closing or earlier upon request.[1]

---

[1]Centex also provided extended warranty protection for major items such as electrical and plumbing systems, and for major defects affecting the load-bearing structures of the home; exterior paint was not covered under the expanded protection. A later version of the extended warranty refers to the use of "stain blocking

Class members admitted knowing the warranty was for one year. The Contract contained an agreement "that there are no other warranties either expressed [sic] or implied." The Contract also included a waiver of all claims for repair, except as covered by the Builder Limited Warranty, and provided that Centex could use the waiver as a defense to later claims.[2]

A Disclosure Addendum was also made part of the Contract, and advised the buyers that the real estate agent represented Centex. It contained the following statement:

Of course, the real estate agent owes to *both parties* to a transaction the obligation of good faith and fair dealing, and the duty to disclose all material facts adversely affecting the property and known by one party but not reasonably ascertainable by the other party.

During a precompletion, preclosing inspection, a Centex manager reviewed the warranty program with the purchaser, and gave each purchaser a Homeowner's Manual detailing the home's features and describing how to maintain the home. Addressing cedar siding and paint,[3] the Manual indicated:

Your home includes *a high quality cedar sided, caulked and*

---

primers," but that section was added after Class members purchased their homes and is not relevant to their claims.

[2]Paragraph 32, entitled "Waiver of Future Claims" provided:

Purchasers hereby waive and relinquish all claims against [Centex] for damages to property or personal injury arising after the date of this contract and relating to any of the following:

. . . .

d. Any claims for repairs or modifications to the property except as specifically covered by [Centex]'s Builder Limited Warranty;

. . . .

This Waiver shall be binding upon purchasers and their heirs, successors, assigns, guests and invitees. Purchasers acknowledge that [Centex] shall be entitled to rely upon this waiver as a complete bar and defense against any claim asserted by purchasers or anyone claiming through purchasers. The deed conveying the property to purchasers shall contain a reference to this waiver.

[3]Both parties refer to the finish variously as paint or stain.

*sealed, painted exterior surface.* Cedar products have inherent characteristics that are uncontrollable. Moisture content is very difficult to regulate in our region of the country and every effort is given to protect the siding when delivered. It is installed, sealed and painted as quickly as possible, but ultimately some moisture is still contained within.

. . . .

All exterior wood surfaces will require repainting periodically . . . . Your home was initially painted with a solid body oil based stain. Subsequent refinishing should be completed using a compatible material.

(Emphasis added.)

The cedar siding Centex used to build these homes has several limitations, including that its tannic acids can leach and stain the paint, its rough surface requires paint that will penetrate the fiber to prevent chipping, and it can be painted only at certain times and with certain products due to the moist environment. To accommodate these limitations, Centex finished its cedar siding with "one coat of heavy-bodied, oil-based opaque stain."

Centex had subcontractors install and stain the cedar siding. The subcontractors sprayed one coat of stain, and then (according to Centex) backrolled it to ensure even application and assist penetration of the wood fibers. According to Centex and letters from two manufacturers, this process was appropriate for Northwest weather conditions and met industry standards. Paint experts on both sides agreed that the finish used was known as "self priming." But the Class' expert maintained that an additional coat of primer was required to meet industry standards, and further that the stain on these homes had not been backrolled. The Class and its expert contend that Centex's failure to properly prepare the cedar by using a primer coat and its failure to backroll the stain resulted in premature deterioration of the finish and the cracking, warping, and mildewing of the siding.

Class members informed Centex that the exterior finish

was cracking, discoloring, bleeding through, peeling off, and molding within three years of purchase. Centex refused these repair requests because the one-year warranty had expired. In August 1996, Centex sent a letter denying any liability, but offering a paint coupon because the stain was not lasting three to five years as anticipated.

The Class sued Centex, claiming damages of approximately $2,500 per home arising from (1) breach of express warranty, (2) negligent misrepresentation, and (3) violation of the CPA. The trial court granted summary judgment in favor of Centex, ruling that (1) Centex complied with the express warranties regarding exterior paint, and the one-year warranty limitation was valid and enforceable under *Southcenter View Condominium Owners' Ass'n v. Condominium Builders, Inc.*, 47 Wn. App. 767, 736 P.2d 1075 (1986), *review denied*, 107 Wn.2d 1028 (1987); (2) Centex complied with its duty to disclose regarding the exterior paint under *Atherton Condominium Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990); and (3) the negligence theories were barred under *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 881 P.2d 986 (1994) and *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 745 P.2d 1284 (1987). The Class appeals.

### Standard of Review

██ ██ We engage in the same inquiry as the trial court when reviewing a summary judgment, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Atherton*, 115 Wn.2d at 516. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton*, 115 Wn.2d at 516 (citing *Morris v. McNicol*, 83 Wn.2d 491, 494,

519 P.2d 7 (1974)). Any doubt about the existence of a genuine issue of material fact is resolved against the moving party. *Atherton*, 115 Wn.2d at 516.

Here, we must decide whether the trial court correctly determined that, viewing the disputed facts most favorably to the Class, the Class did not establish any legally cognizable cause of action.

## Warranty Claim

The Class argues that the disclaimer of warranties in the Real Estate Contract is inapplicable to its claim, and that Centex's promises created express warranties, including a warranty that it would prime the cedar siding.

■ ■ Our courts have recognized the validity of time limitations on warranties in real estate contracts. In *Southcenter View*, a condominium association sued the owner/developers, the builder, and the selling agent. Its claims included breach of express and implied warranties. The contract included a one-year warranty limitation. *Southcenter View*, 47 Wn. App. at 768-70. The trial court dismissed the claims and this court affirmed, holding that the one-year warranty limitations were valid. *Southcenter View*, 47 Wn. App. at 770. The court distinguished the contractual limitation on the warranty term from contracts involving total exclusion of warranties or remedies, and rejected the argument that the limitations were "foisted upon naive and unsuspecting home buyers." *Southcenter View*, 47 Wn. App. at 771.

As in *Southcenter*, the warranty limitation and disclaimer here are valid and enforceable. The Class attempts to distinguish this case by arguing that Centex's warranty limitation applies only to defective materials and workmanship, and that its claim involves materials not used and work not done. This argument is unpersuasive. Use of materials for an unsuitable purpose is defective workmanship. Even assuming, therefore, that an express warranty was created by sales materials promising top quality, and/or

by the Homeowner's Manual describing the exterior surface as "high quality, cedar sided, caulked and sealed," any such warranty was subject to the one-year limitation, the disclaimer, and the waiver provisions of the Real Estate Contract. The trial court correctly dismissed this claim.

## Negligent Misrepresentation Claim

The Class next argues that the trial court erred by dismissing its negligent misrepresentation claim because it is different from a negligent construction claim, and thus is not barred by the economic loss rule, and even if the rule applies, the Class' claim is within the exception for loss to other property.

■■ Washington has adopted the "economic loss rule," barring claims for negligent misrepresentation when a contract allocates liability. *See Berschauer/Phillips*, 124 Wn.2d at 825, 828; *Atherton*, 115 Wn.2d at 526-27; *Stuart*, 109 Wn.2d at 417-23. The evolution of this rule in Washington is instructive.

In *Stuart*, condominium homebuyers sought damages from the builder-vendor for defects in private decks and walkways. The damages asserted were solely economic, consisting of the costs of repairs. No claim was made for personal injury or property damage. The Supreme Court recognized that "homeowners faced with losses that are not of their own making present a sympathetic case," but held that Washington does not recognize a cause of action for negligent construction on behalf of individual homeowners. *Stuart*, 109 Wn.2d at 417-18.

In *Atherton*, a condominium association sought damages for construction defects from the builder-vendor, the architect, and the building inspector. Relying on *Stuart*, the Supreme Court affirmed the dismissal of these claims, again holding that Washington does not recognize a cause of action for negligent construction. *Atherton*, 115 Wn.2d at 526.

In *Berschauer/Phillips*, the court relied on these two

cases in applying the economic loss rule to allegations of negligent misrepresentation in a construction case, holding that recovery of economic loss due to construction delays was limited to remedies in the contract:

> We follow the *Stuart* and *Atherton* line of cases and maintain the fundamental boundaries of tort and contract law by limiting the recovery of economic loss due to construction delays to the remedies provided by contract. We so hold to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. We hold parties to their contracts. If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract.

*Berschauer/Phillips*, 124 Wn.2d at 826-27.

The Class asserts that this rule does not (or should not) apply to negligent misrepresentation claims, and points to several cases from other jurisdictions declining to apply the rule in this context. Yet in announcing the rule, the *Berschauer/Phillips* court characterized its application of the economic loss rule as a "bright line distinction between the remedies offered in contract and tort with respect to economic damages [which] encourages parties to negotiate toward the risk distribution that is desired or customary." *Berschauer/Phillips*, 124 Wn.2d at 827. The court acknowledged that Washington recognizes claims for negligent misrepresentation under the RESTATEMENT (SECOND) OF TORTS § 552 (1977), but rejected reliance on tort principles when a contract controls: "We hold that when parties have contracted to protect against potential economic liability, as is the case in the construction industry, contract principles override the tort principles in § 552 and, thus, purely economic damages are not recoverable." *Berschauer/Phillips*, 124 Wn.2d at 827-28.

The Class attempts to exempt its contracts from the holding of *Berschauer/Phillips* by emphasizing that they involve

"private homebuyers in the residential market." This distinction did not persuade the court in *Stuart*, however. *Stuart*, 109 Wn.2d 417-23. The Class also makes a general argument about the type of wrong asserted in the negligent misrepresentation claim, i.e., Centex's breach of duty to exercise reasonable care in communicating information relevant to the transaction. But the *Berschauer/Phillips* court held the economic loss rule applied to bar that exact claim. *Berschauer/Phillips*, 124 Wn.2d at 827-28.

We conclude that *Berschauer/Phillips* controls the disposition of this case, and that when a contract allocates liability, the economic loss rule bars claims of negligent misrepresentation by homebuyers against builder-vendors.

The Class alternatively asserts that even if the economic loss rule applies to negligent misrepresentation claims, it does not apply here because the damages asserted are not limited to economic losses. Under the economic loss rule, defects in materials evidenced by deterioration are characterized as economic losses, for which claims sounding in tort are barred; defects causing physical injury or harm to other objects are not characterized as economic losses, and actions for such damage are not barred by the rule. *See Stuart*, 109 Wn.2d at 420. The Class describes its claim as one alleging harm to other property, based upon its expert's opinion that the "defective" stain caused mildewed, warped, and cracked siding. But the Class has alleged no harm to property beyond the affected siding itself. This is nothing more than economic damage, and thus the claim is barred by the economic loss rule.

## CPA Claim

The Class also argues that the trial court erred by dismissing its CPA claim because sufficient evidence established a prima facie case. The CPA makes it unlawful to engage in unfair or deceptive acts or practices in trade or commerce. RCW 19.86.020. Its purpose is to protect the public and foster honest competition. RCW 19.86.920. The CPA applies to activities both before and after a sale, and

may be violated by failure to disclose material facts. *Smith v. Sturm, Ruger & Co.*, 39 Wn. App. 740, 747-48, 695 P.2d 600, *review denied*, 103 Wn.2d 1041 (1985). To survive summary judgment, a prima facie showing of five elements is required: (1) an unfair or deceptive act or practice, that (2) occurred in trade or commerce, (3) impacted a public interest, (4) injured the Class' business or property, and (5) was causally related to the injury. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Only the first element is disputed here. To prove that Centex engaged in an unfair or deceptive act, the Class need not show that the act was intended to deceive, but only that the alleged act had the capacity to deceive a substantial portion of the public. *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30, 948 P.2d 816 (1997). Whether a party committed an act is reviewed for substantial evidence; but whether an act gives rise to a CPA violation is reviewed as a question of law. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997); *see also Sing*, 134 Wn.2d at 30.

The Class contends that Centex engaged in unfair and deceptive practices by failing to disclose known defects in the exterior finish, and failing to conform to industry standards. It is undisputed that Centex did not disclose the problems with the finish; whether Centex complied with industry standards is disputed.

Our cases establish a general duty on the part of a seller to disclose facts material to a transaction when the facts are known to the seller but not easily discoverable by the buyer. *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 51, 554 P.2d 349 (1976).[4] In *Testo*, an automobile dealer failed to disclose that a Camaro had been modified for racing, thereby increasing the costs of repairs and mainte-

---

[4]*Cf. Colonial Imports, Inc. v. Carlton N.W., Inc.*, 121 Wn.2d 726, 732, 853 P.2d 913 (1993) (citing *Favors v. Matzke*, 53 Wn. App. 789, 796, 770 P.2d 686, *review denied*, 113 Wn.2d 1033 (1989)) (discussing sources of seller's duty to disclose material defects).

nance. The court held that the dealer's act of withholding facts material to the sale was a deceptive act under the CPA. *Testo*, 16 Wn. App. at 51-52.

The duty to disclose material facts has also been recognized in real estate transactions. In *McRae v. Bolstad*, 101 Wn.2d 161, 162-65, 676 P.2d 496 (1984), the purchasers of a home successfully prosecuted an action under the CPA when the sellers failed to disclose sewer and drainage problems. In holding that the claim satisfied the CPA's public interest element, the court determined that the seller's failure to disclose material facts about the property was an unfair and deceptive act or practice. *McRae*, 101 Wn.2d at 165-66. The court also noted that the "failure of a salesman to disclose information has long been recognized as the basis for an action under RCW 19.86." *McRae*, 101 Wn.2d at 166 (citing *Testo*, 16 Wn. App. at 51-52).

■ ■ In addition to the general duty to disclose, the Disclosure Addendum to the parties' Real Estate Contract created an identical contractual duty of disclosure. The Addendum recites that Centex's agent has "the duty to disclose all material facts adversely affecting the property and known by one party but not reasonably ascertainable by the other party."

Thus both case law and the parties' contract imposed a duty of disclosure on Centex regarding material adverse facts not easily discoverable by the buyers. Whether the facts in question are such facts is the only remaining issue.

Viewing the evidence most favorably to the Class, Centex knew that its purchasers expected high quality exterior finishes as described in its sales materials and its Homeowner's Manual. It also knew that the exterior finish on its homes was prematurely deteriorating to such an extent that nearly one-third of some 800 purchasers in Western Washington had complained of the problems experienced by the Class here; that the product manufacturer recommended use of a primer; and that its own subcontractors were concerned and had suggested the use of a different product. This amounts to knowledge of premature failure

of the exterior finish on new homes, which is a material fact adversely affecting the property and not likely to be easily discovered by the buyers.

Although the trial court's ruling did not discuss the CPA, the court ruled that Centex satisfied its duty of disclosure under *Atherton*. In *Atherton*, the court set forth a builder-vendor's duty of disclosure in the context of a claim for fraudulent concealment of construction defects:

> "Where there are concealed defects in demised premises, dangerous to the property, health or life of the tenant, which defects are known to the landlord when the lease is made, but unknown to the tenant, and which careful examination on his part would not disclose, it is the landlord's duty to disclose them to the tenant before leasing, and his failure to do so amounts to a fraud."

*Atherton*, 115 Wn.2d at 524 (quoting *Obde v. Schlemeyer*, 56 Wn.2d 449, 452, 353 P.2d 672 (1960) (quoting *Perkins v. Marsh*, 179 Wash. 362, 365, 37 P.2d 689 (1934))). The *Atherton* court further observed that "the defect complained of must 'substantially affect[ ] adversely the value of the property or operate[ ] to materially impair or defeat the purpose of the transaction.' " *Atherton*, 115 Wn.2d at 524 (alterations in original) (quoting *Mitchell v. Straith*, 40 Wn. App. 405, 411, 698 P.2d 609 (1985)).

We agree with Centex and the trial court that the nondisclosure here would not be actionable under the *Atherton* test. But *Atherton* is not the only source of a duty to disclose. There is a difference between a CPA violation and fraud. In the context of a consumer transaction in which a deceptive act has the capacity to deceive a substantial portion of the public, a different test applies.[5] As previously discussed, numerous cases establish a duty to disclose material facts adversely affecting the property, not just those facts pertaining to concealed defects dangerous

---

[5]*See, e.g., Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 559-62, 825 P.2d 714, *review denied*, 120 Wn.2d 1002 (1992) (affirming jury's implicit finding of deceptive act under CPA, where same jury found no fraud).

to the property, health, or life of the purchaser. The purposes of the CPA—to protect members of the public from injury in their property or business by reason of unfair or deceptive acts and practices in trade or commerce—would hardly be served if deception were not actionable unless the consumers' very lives were at stake. *See* RCW 19.86.090; RCW 19.86.920. The CPA has repeatedly been applied in the context of home purchases. *See Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 33, 686 P.2d 465 (1984) (CPA applied to suit between builder and purchaser of five-unit condominium complex); *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wn. App. 834, 840, 942 P.2d 1072 (1997), *review denied*, 134 Wn.2d 1027 (1998) (CPA applied to suit between home purchaser and real estate sales agent); *Keyes v. Bollinger*, 31 Wn. App. 286, 292, 640 P.2d 1077 (1982) (CPA applied in suit between home buyer and contractor). *Atherton* is thus irrelevant to analysis of the CPA.[6] Finally, the *Atherton* test does not apply for another reason: Centex accepted a different test in the disclosure addendum.[7]

We hold on the record presented that a genuine issue of material fact exists as to the first element of the Class' CPA claim, that is, whether Centex engaged in an unfair or

---

[6]The parties also extensively discussed the *Atherton* analysis in relation to the duty of disclosure in the Class' negligent misrepresentation claim (in the negligent omission context). Since we reject that claim under the economic loss rule, we do not decide whether *Atherton* describes the duty of disclosure for such a cause of action.

[7]The Class additionally asserts that failure to comply with industry standards is itself a violation of the CPA. We reject that argument. As Justice Rosellini stated in his concurrence in *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 55-56, 686 P.2d 465 (1984):

Mere proof that a contractor is a second-rate builder who does not live up to industry standards does not tend to establish unfair or deceptive solicitation of the consuming public. There must be unfair or deceptive acts or practices which induce the consuming public to act or refrain from acting in order for the Consumer Protection Act to come into play. Thus, in *Keyes v. Bollinger*, 31 Wn. App. 286, 292, 640 P.2d 1077 (1982), the court held that a contractor engages in an unfair or deceptive act by estimating or representing completion dates to purchasers, representations with which he is unable to substantially comply due to reasons which should be reasonably foreseeable in light of the contractor's knowledge and experience.

deceptive act, and the trial court therefore erred in granting summary judgment as to that claim.

## Centex's Motion to Strike

■ Centex moved to strike parts of the Class' reply brief, on grounds that the Class improperly raises arguments not considered by the trial court and materially misrepresents the record. The Class responds that Centex's motion is no more than an improper attempt to respond to the reply brief which is prohibited by the rules of appellate procedure and is sanctionable. *See* RAP 10.1; RAP 10.7. After careful review of the motion, we agree with the Class. We therefore deny the motion to strike and, instead, strike the motion itself.

## Conclusion

We affirm the trial court's dismissal of the breach of warranty and negligent misrepresentation claims, but reverse the dismissal of the Consumer Protection Act claim, and remand for further proceedings.

AGID, A.C.J., and WEBSTER, J., concur.

After modification, further reconsideration denied December 14, 1998.

Review denied at 137 Wn.2d 1034 (1999).

---

While the failure to adhere to industry standards does not by itself constitute a deceptive act or practice, it may nonetheless be evidence of a deceptive act or practice. Here, questions of fact are raised as to whether industry standards required that a separate primer coat be applied, and/or that the stain be back-rolled.