60 Wn.2d 468 (1962)
374 P.2d 549
EDWARD A. KASEY et al., Respondents,
v.
SUBURBAN GAS HEAT OF KENNEWICK, INC., Appellant.
LEE LEONARD et al., Respondents,
v.
EDWARD A. KASEY et al., Respondents,
SUBURBAN GAS HEAT OF KENNEWICK, INC., Appellant.[*]
No. 35955.
The Supreme Court of Washington, Department One.
September 13, 1962.
Cheney & Hutcheson, for appellant.
Loney, Westland & Koontz, by James M. Koontz and Horton & Wilkins, by Hugh B. Horton, for respondents.
HILL, J.
This is a propane gas explosion case. The explosion wrecked the frame building which housed the glass manufacturing plant of Edward A. Kasey and Howard L. Brightman, doing business as Northwest Laboratories & Glass Supplies and hereinafter referred to as "Northwest."
The propane gas was furnished by Suburban Gas Heat of Kennewick, Inc., hereinafter referred to as "Suburban."
Northwest sued Suburban, and the case was submitted to the jury on two theories: (1) negligence in delivering liquefied petroleum gas (propane) containing excessive water which caused malfunctioning of the controls in Northwest's floor furnace, which, together with work on *470 the pilot light and generator (improperly done by Suburban's service man), permitted propane gas to escape into the building; and (2) breach of implied warranty of fitness for the purpose intended, Northwest having relied on the skill and judgment of Suburban, and the gas delivered having contained dangerous properties, i.e., an overabundance of moisture.
The jury brought in a verdict for Northwest in the sum of $10,500, and judgment was entered in that amount.
The Leonards, who owned the Owl Cafe situated almost 200 feet away from the glass plant, sued both Suburban and Northwest on the theory of negligence, relying on res ipsa loquitur; and the jury brought in a verdict against Suburban for $8,500, of which more than $7,000 must have been for Mrs. Leonard's emotional shock, as the total property damage accounted for only $852.67 and the medical expense for only a few hundred more. Judgment was entered on the verdict.
Suburban appeals from both judgments. The cases were consolidated for trial and are consolidated on this appeal.
Suburban urges that there was no proof of negligence. There was evidence from which the jury could find that there was water in the propane gas, which caused the malfunctioning of the controls in Northwest's gas furnace and allowed gas to escape. There was also evidence from which the jury could find that Suburban's repair man had improperly placed and attached the pilot light, which was also found to be partially plugged by metal particles, and consequently the escaping gas was not ignited in the furnace.
All of this was vigorously disputed by Suburban. Our examination of the record shows substantial evidence to sustain findings of negligence on the issue of water in the propane gas and on the issue of defective workmanship by Suburban's repair man.
Suburban urges that there was no proof that such negligence, if established, was the proximate cause of the explosion. We cannot agree. There was evidence, particularly that of the expert J.M. Knisely, from which the jury could *471 have found that the negligence referred to was the cause of the explosion. His testimony also countered Suburban's claim that the cause was the negligence of Northwest's own employees in failing to shut off the gas at certain torch valves where they had worked the evening before the explosion.
[1] Negligence and proximate cause being established by substantial evidence, this court will not substitute its judgment for that of the jury. Tabert v. Zier (1962), 59 Wn. (2d) 524, 368 P. (2d) 685.
Suburban, however, urged that if there was water in the propane and if it was the proximate cause of the explosion, it was not responsible as it was only a dealer and not a manufacturer.
It is not disputed that the general rule is as Suburban contends: That a retailer is not ordinarily responsible for latent defects in a manufactured product. Ringstad v. I. Magnin & Co. (1952), 39 Wn. (2d) 923, 239 P. (2d) 848.
[2] Had Suburban been able to point to one of its manufacturers and say that "Standard," "Texaco," or some other company had supplied the propane gas in question, a very different question would be presented. Unfortunately, for Suburban, it mixed the gases from various suppliers and thus eliminated the possibility of holding any of the actual manufacturers. It also sold under Suburban's name. Under the circumstances of this case, Suburban became legally responsible as a manufacturer.
Suburban urges that the trial court erred in submitting the case to the jury on the theory that there was an implied warranty of fitness.
[3] Its first contention on this phase of the case is that it was engaged in furnishing a public service and not in the sale of personal property within the meaning of the warranty provisions of the Uniform Sales Act. We find no cases supporting such a distinction.
Suburban places its reliance on Boyle v. King Cy. (1955), 46 Wn. (2d) 428, 282 P. (2d) 261, in which we held that a contract to collect garbage was a personal service *472 contract. In that case plaintiff paid King County $40 a month for the privilege of removing the garbage from the county's sanatorium, which garbage he fed to his hogs  many of which died from the effects of poison negligently placed or permitted to be placed in the garbage. When he sought damages for the loss of his hogs, there was a judgment for the county. The plaintiff appealed, relying on an implied warranty of fitness for hog feed. We held that the contract for garbage removal was not a sale. We there pointed out that the principal reason for not holding the contract to involve a sale of goods was that there was no relation
"... between the forty dollars per month paid for the privilege of removing the garbage and the value of the garbage, the amount of which would vary from month to month. It is questionable whether the transaction can reasonably be construed as a sale...." (p. 433)
That case is readily distinguished. In the present case there is no contention that the payment was not on the basis of the amount of propane gas delivered, and it cannot be seriously argued that Suburban was not aware of the purpose for which the gas was purchased.
Suburban argues that Northwest never relied on Suburban's skill and judgment in making the purchases; and that if Northwest relied on the skill of anyone, other than itself, it was upon the skill and judgment of the manufacturers of the propane gas. As we have indicated, Suburban stood in the place of the manufacturers and was, for all practical purposes, the manufacturer.
[4] The act of purchase and use of a product manufactured for that use is evidence of reliance on the skill and judgment of the manufacturer; and, in the absence of evidence to the contrary, meets the requirement of reliance. As we said in Baum v. Murray (1945), 23 Wn. (2d) 890, 897, 162 P. (2d) 801:
"... regardless of what we may ultimately decide when a case is presented involving a retailer only, the manufacturer-retailer stands in a different position, as he is the one who is in the best position to ascertain and know the *473 quality and fitness for purpose of the food he manufactures and sells, and it necessarily follows that purchasers of food put up in sealed containers, as the sausage in question was, (encased in sausage skin) must and do rely upon his skill and judgment."
While that was a food case, the quotation is applicable to the present case. Northwest had no way of determining whether the propane gas delivered to it was fit for the use intended, but necessarily had to rely upon Suburban's skill and judgment.
[5] Suburban argues that the product is generally known by its trade name "propane gas," and comes within RCW 63.04.160(4):
"In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."
What Suburban overlooks, in the argument, is that what it contracted to sell and deliver was propane gas and that what it sold and delivered was propane gas with water in it (or so the jury must have found). We are not concerned with damages caused by propane gas, but with damages resulting from the fact that there was water in the propane gas sold by Suburban. As said in Balthazor v. B & B Boiler & Supply Co. (1950), 169 Kan. 188, 192, 217 P. (2d) 906,
"In the case we are considering propane is a name given to a liquid which is really natural gas compressed at a low temperature and when released by means of the regulator through a small vent becomes an inflammable gas which flows through pipes to stoves. When a purchaser buys propane he buys it to burn and it can only be burned if it escapes through a regulator such as we have here. There was substantial evidence that propane when it is manufactured is perfectly dry, that is, it has no moisture content. What plaintiffs bought was a perfectly dry product with no moisture content whatever, while what was delivered to them was gas with water in it...."
Suburban urges that timely notice of breach of warranty was not given. This contention is founded upon another *474 section of the Uniform Sales Act,[1] RCW 63.04.500, which provides that the buyer must give the seller notice of any breach of any promise or warranty "within a reasonable time" after the buyer knows of the breach. The explosion was March 31, 1959. It was stipulated that on April the 28th J.M. Knisely notified Northwest that he had found water in the gas line, the furnace controls, and the tank; and that on May the 22nd Northwest so notified Suburban and asserted a claim for damages. Suburban was also notified at that time that the furnace controls and tank were at Mr. Knisely's place of business in Seattle and available for inspection. It was further stipulated that the words "breach of warranty," as a basis for a claim for damages, were not used until the service of the complaint on August 4, 1959.
[6] Whether the notice of May the 22nd was sufficient, and, if not, whether the notice of August the 4th was timely were jury questions. Bleyhl v. Tea Garden Products Co. (1948), 30 Wn. (2d) 447, 457, 191 P. (2d) 851; Baum v. Murray, supra. In the Bleyhl case, supra, we said:
"What constitutes `notice within a reasonable time,' as provided in Rem. Rev. Stat., § 5836-49, supra [RCW 63.04.500], is usually a mixed question of law and fact, dependent upon a variety of facts and circumstances of the particular case, and generally resolving itself into a question of fact to be determined by the jury, upon proper instructions by the court...."
We turn now to the appeal from the judgment secured by the Leonards.
Suburban here urges that the breach of implied warranty was not available to the Leonards because there was no privity of contract.
*475 The Leonards rely upon our cases, such as Wise v. Hayes (1961), 58 Wn. (2d) 106, 361 P. (2d) 171; Dimoff v. Ernie Majer, Inc. (1960), 55 Wn. (2d) 385, 347 P. (2d) 1056; Freeman v. Navarre (1955), 47 Wn. (2d) 760, 289 P. (2d) 1015; Baxter v. Ford Motor Co. (1932), 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A.L.R. 521. These cases make it clear that there are three exceptions to the rule that if there is no contractual privity there can be no warranty, i.e., (1) where the article causing the injury is of a noxious or dangerous nature; (2) where fraud or deceit has been shown on the part of the offending party; or (3) where the manufacturer has been negligent in some respect with reference to the sale or construction of an item not imminently dangerous. Gas is an inherently dangerous substance. Parkinson v. California Co. (1956), 233 F. (2d) 432 (C.A. 10th), and cases cited.
[7] However, for there to be recovery on a breach of an implied warranty, the plaintiff must have bought something from somebody. We agree with Suburban that the Leonards cannot recover on the theory of an implied warranty; and the trial court erred in instructing on that theory.
However, this does not require a new trial, for the trial court wisely submitted interrogatories to the jury, and the jury expressly found that the negligence of Suburban was a proximate cause of the explosion; and that finding is sufficient to sustain the judgment.
Suburban here argues that the jury must have allowed in excess of $7,000 for Mrs. Leonard's fright or emotional shock and that, under our cases, there can be no recovery for her fright since there was no impact nor physical invasion of her person. Venske v. Johnson-Lieber Co. (1955), 47 Wn. (2d) 511, 288 P. (2d) 249, and cases there cited. This rule has been under severe attack. See discussion in Browning v. Slenderella Systems of Seattle (1959), 54 Wn. (2d) 440, 447, 341 P. (2d) 859. However, we do not need to consider whether or not the rule should be changed.
[8] There is evidence that the shock waves from the explosion were of sufficient intensity to blow two heavy *476 plate glass windows in the street front into the building occupied by the Leonards, and then rush through it blowing out twenty-five window panes and tearing drapes to pieces. Mrs. Leonard testified that she was "shook ... from shock"; that it shook her all over; and that she suffered discomfort in the neck and shoulders as a result of the shock and fright. While she testified that she was not knocked down, her husband testified "she was knocked over on the fountain; that is what she told me." (This was clearly hearsay, but it came in without objection and there was no motion to strike it.) The doctor (now dead) who examined her two days after the explosion, had in his records:
"... She had tremors and was very apprehensive; insomnia; has developed pains and muscle spasms in the cervical spine; reflexes hyperactive."
Prosser, in his Law of Torts (2d ed.) pp. 178-79, summarized the cases relating to "impact" as follows:
"... `Impact' has meant a slight blow, a trivial jolt or jar, a forcible seating on the floor, dust in the eye, or the inhalation of smoke. The requirement has even been satisfied by a fall or the plaintiff's own wrenching of her shoulder in reaction to the fright...."
We are satisfied that the testimony we have outlined was sufficient to establish impact or physical injury, if that be necessary.
[9] Suburban argues that the judgment was excessive on the basis of the injury sustained. There was testimony of severe emotional shock, following the explosion, with pain and muscle spasms in the cervical spine. One doctor testified that Mrs. Leonard has, at times, an "auricular fibrillation" with heartbeats, on occasion, from 140 to 200 a minute. It was his opinion that while the explosion did not cause the "auricular fibrillations," it has definitely made them worse. It is also his opinion that she would always be subject to such attacks.
While the verdict seems on the high side, in the light of her pre-existing condition and her prior "auricular *477 fibrillations," we find no indication of passion or prejudice and no reason to impute to the jurors a disregard of their duty.
[10] Suburban also urges that there was prejudicial misconduct in the closing argument of counsel for the Leonards. Suburban's counsel explains his failure to object to the argument at the time it was made, as tending to give it more emphasis in the minds of the jurors. The record indicates that the objectionable character of the argument was not brought to the trial court's attention after the jury had retired and when there was still an opportunity for the trial court to recall them and direct them to disregard it, but only on the motion for a new trial. As we have frequently said:
"`... The remedy for misconduct on the part of any one during the progress of a trial is to call the attention of the presiding judge to the alleged misconduct and move by some proper procedure to have the matter corrected. It is not timely to await the result of the trial and then complain only in the case of an adverse verdict....'" (State v. Smails (1911), 63 Wash. 172, 115 Pac. 82), quoted in Jones v. Hogan (1960), 56 Wn. (2d) 23, 28, 351 P. (2d) 153.
In addition to the issues heretofore discussed, Suburban has made other assignments of error, including six relating to instructions given and twenty-one relating to proposed instructions refused. It is apparent that Suburban has left no stone unturned in its attack upon these judgments (as one member of the court remarked in conference "no turn was left unstoned").
However, we find no prejudicial error in any of the assignments of error not covered in our prior discussion, and feel that a prolonging of this opinion would be of no value as precedent and of no interest to anyone except the immediate litigants.
We have already pointed out that any error relating to implied warranty could not affect the Leonard judgment, as it must rest on the finding of negligence.
Northwest was entitled to recover both on the theory *478 of negligence and implied warranty, and if either theory withstood assault, error solely relating to the other would not be prejudicial.
The judgments are affirmed.
FINLEY, C.J., WEAVER, ROSELLINI, and FOSTER, JJ., concur.
November 1, 1962. Petition for rehearing denied.
NOTES
[*] Reported in 374 P. (2d) 549.
[1] "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor." RCW 63.04.500