[No. 51614–6. En Banc. September 18, 1986.]

DONALD FRICKEL, ET AL, *Respondents,* v. SUNNYSIDE
ENTERPRISES, INC., ET AL, *Appellants.*

*Owens, Weaver, Davies, Mackie & Lyman* and *Alexander W. Mackie,* for appellants.

*Stritmatter, Kessler & McCauley, Keith L. Kessler,* and *F. Mark McCauley,* for respondents.

BRACHTENBACH, J.—The main issue is whether an implied warranty of habitability applies to the sale of an

apartment complex, under the facts of this case, and in the face of a contractual disclaimer of any such warranty. The trial court found there was such an implied warranty and held for the buyers. The court did not deal with the contractual disclaimer. We accepted certification from the Court of Appeals. We reverse.

The facts are important. The plaintiffs were seeking an investment which would give them a retirement income and a tax benefit. The defendants were builders of apartment complexes for their own ownership. Defendants did not build for resale. Defendants had built over 100 apartment units, but always for their own ownership and management. These units were no exception: the defendants expected to own and manage them.

The defendants were approached by a realtor who represented the buyers. The property was not on the market. The buyers' agent asked the sellers—would they sell? They answered—yes, for the right price.

This establishes the first point. The property was not built for resale. The builders intended it to be held within their own inventory and management.

The apartment complex consisted of five buildings. It was built in stages. The first four buildings, containing 28 units of apartments, had been completed and occupied by tenants—some for approximately 18 months. The last building had only been framed in when the owners were approached by the buyers' agent.

The record is silent as to what negotiations, if any, went on between the sellers and buyers. A contract was prepared by an attorney. The buyers, accompanied by their own attorney, went to the office of the lawyer who had prepared the contract. Somehow the parties agreed upon a sale price of $700,000 with $85,000 down. The contract was expressly tailored to this transaction. It recognized and accounted for tenants' cleaning deposits and last month's rent deposits. It recognized that Building 5 was incomplete. It set the standards for completion as well as needed repairs to the existing buildings.

Of importance to this controversy, the contract included this clause:

> The purchaser agrees that full inspection of said real estate has been made and that neither the seller nor his assigns shall be held to any covenant respecting the condition of any improvements thereon nor shall the purchaser or seller or the assigns of either be held to any covenant or agreement for alterations, improvements or repairs unless the covenant or agreement relied on is contained herein or is in writing and attached to and made a part of the contract.

Clerk's Papers, at 9. The contract further stated:

> The purchaser assumes all hazards of damage to or destruction of any improvements now on said real estate . . .

Clerk's Papers, at 10.

The sale occurred in December 1976; by 1980 some problems with outside stairways developed. By 1983, after this suit was commenced, it was learned that the foundations were inadequate and improperly designed. Apparently the problem is that the foundations were not adequately designed to accommodate the soil conditions. The seller–builders had built to the specifications of the City of Hoquiam. In fact, the City rejected the seller–builders' first foundation plans. The seller–builders then built to the exact specifications of the City, even though, it turns out, those specifications did not meet the City's own building code.

The seller–builders do not challenge the trial court's findings that there were serious defects in the foundations and that improper construction has resulted in a situation where extensive repairs are necessary (at a cost of $330,000 according to the trial court) to prevent a foundation failure within 8 to 9 years. (The normal life expectancy of such buildings is 50 to 60 years.)

Two questions result. First, does a builder of an apartment complex, built not for resale, but for the seller's own inventory, guarantee to an unsolicited buyer that the buildings are so constructed that they are free from design

errors? Put another way, does a builder who complies with the standards of the governing municipal entity, in a commercial setting, promise the buyer of those units that all of the risk of faulty construction is upon the builder? Certainly there was no such contractual undertaking. Indeed, the contract says otherwise. Only if this court substitutes its judgment for that of the parties can the buyer prevail.

The second question is the significance of the contractual disclaimer, an issue not addressed by the trial court.

The first question—*i.e.*, the imposition of an implied warranty—is simply a matter of public policy to be determined by this court. Certainly it was not within the contemplation of the parties.

As a matter of policy, determined by this court, it seems apparent that a builder who puts a house on the market, brand new and never occupied, has some responsibility to the ultimate buyer. The builder built the thing. It was intended to be sold to a buyer for occupancy by the buyer—not as an assemblage of concrete and pieces of wood, but as a residence. It is no different from the manufacturer of an automobile. The auto should run down the road without wheels falling off and new houses should provide habitation without foundations falling apart. This court and other courts have recognized this principle. *See, e.g., House v. Thornton*, 76 Wn.2d 428, 457 P.2d 199 (1969); *Yepsen v. Burgess*, 269 Or. 635, 525 P.2d 1019 (1974); *Tavares v. Horstman*, 542 P.2d 1275 (Wyo. 1975); *Petersen v. Hubschman Constr. Co.*, 76 Ill. 2d 31, 389 N.E.2d 1154 (1979); *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538 (Tenn. 1982). *See generally* Annot., *Liability of Builder–Vendor or Other Vendor of New Dwelling for Loss, Injury, or Damage Occasioned by Defective Condition Thereof*, 25 A.L.R.3d 383 (1969) and cases cited therein.

Thus, in *House v. Thornton, supra,* we held that the sale of a new house by a vendor–builder to the first intended occupant carries with it an implied warranty "that the foundations supporting it are firm and secure and that the

house is structurally safe for the buyer's intended purpose of living in it." 76 Wn.2d at 436. There, the vendor–builders, a real estate broker and a building contractor, constructed a residence for purposes of sale. The buyers, a husband and wife, purchased the "brand new house" with the intention of making it their family home. In time, however, the house proved to have structural defects which rendered it unfit for further occupancy. In imposing an implied warranty of habitability or fitness upon the vendor–builders, this court, in effect, "did no more than apply a rule of common sense to the kind of transaction that recurs perhaps more than a million times annually in the country—the purchase of a brand new house." *Berg v. Stromme,* 79 Wn.2d 184, 196, 484 P.2d 380 (1971), discussing *House v. Thornton, supra* (same rationale used for adoption of implied warranty in sale of brand new automobiles).

The reach of this implied warranty was clarified but not extended in *Klos v. Gockel,* 87 Wn.2d 567, 554 P.2d 1349 (1976), which involved the warranty liability of an occasional builder of houses who built the house at issue primarily for her own personal use rather than for purposes of resale and sold it to the plaintiff–buyers after living in it for a year. In finding no liability under the rule of *House v. Thornton, supra,* we made it clear that an implied warranty of habitability or fitness does not apply to every sale of a new house. The sale must be "commercial rather than casual or personal in nature." *Klos v. Gockel, supra* at 570. In other words, the warranty only applies where the new dwelling is built for purposes of sale by a builder–vendor in the business of building such dwellings. *Klos v. Gockel, supra. See, e.g., Kirk v. Ridgway,* 373 N.W.2d 491 (Iowa 1985); *Dixon v. Mountain City Constr. Co., supra* at 540; *Bolkum v. Staab,* 133 Vt. 467, 346 A.2d 210 (1975).

■ It is clear that the facts of this case do not come within the implied warranty doctrine as fashioned by this court in *House v. Thornton, supra* and *Klos v. Gockel, supra.* Unlike the sale of a house—brand new and never

occupied—to its first intended occupant, the sale here involved the purchase of a 40–unit apartment complex, of which 28 units were completed at the time of sale and occupied by tenants for as long as 18 months. The defendants did not build apartment complexes for resale but for their own ownership and management purposes. The apartment complex at issue here was no different. It was not built for purposes of sale nor had it been listed or placed on the market when the buyers approached the defendants.

Moreover, we are not persuaded that the implied warranty of habitability should be extended, as a matter of public policy, to the sale of property under the facts and circumstances of this case. The implied warranty of habitability or fitness is based upon judicial recognition that the rule of caveat emptor—premised as it is on an arm's length transaction between buyers and sellers of comparable skill and experience—has little relevance when applied to the sale of new homes in today's market. *See, e.g., House v. Thornton, supra* at 435–36; *Tavares v. Horstman, supra* at 1282; *Yepsen v. Burgess, supra* at 639–40. The necessity of imposing an implied warranty upon builder–vendors of new houses, as a matter of public policy, to protect the ordinary purchasers of such homes, was well stated by the Illinois Supreme Court in *Petersen v. Hubschman Constr. Co., supra.*

> Many new houses are, in a sense, now mass produced. The vendee buys in many instances from a model home or from predrawn plans. The nature of the construction methods is such that a vendee has little or no opportunity to inspect. The vendee is making a major investment, in many instances the largest single investment of his life. He is usually not knowledgeable in construction practices and, to a substantial degree, must rely upon the integrity and the skill of the builder–vendor, who is in the business of building and selling houses. The vendee has a right to expect to receive that for which he has bargained and that which the builder–vendor has agreed

to construct and convey to him, that is, a house that is reasonably fit for use as a residence.

*Petersen,* at 40.

Unlike the inherently unequal bargaining position between the average home buyer and the vendor–builder of new houses, the factual scenario here is far different. The sale in this case is essentially an arm's length transaction between an unsolicited buyer who sought to invest in an ongoing if still uncompleted commercial enterprise and a builder–vendor who built an apartment complex for its own use and management and not for purposes of sale. It may be that the plaintiffs were relatively inexperienced as investors in commercial property. However, the plaintiffs, through their agent, sought out the property; it was not on the market. They had their own lawyer. They could and should have protected themselves in the contract negotiations. They had an opportunity to inspect and investigate. If plaintiffs were unsure of their investment, they were in a position to seek expert help, particularly with the plans and specifications identified in the contract and readily available for inspection which would have revealed the potential problems. They chose not to do so.

There is in this case no claim of fraud or misrepresentation. The seller–builders built to the exact specifications of the City. The construction was defective because of a combination of soil conditions and construction quality.

When competent persons deal at arm's length, with no claim of fraud, no claim of misrepresentation, no claim of an adhesion contract, with an opportunity to inspect and investigate, when the contract contains a specific disclaimer, when all of the facts are present, we see no policy reasons for this court to impose upon the sellers a guaranty which neither party negotiated nor expected.

There is no question but that the buyers will suffer a severe financial loss from the ownership of these apartments. We find no principle of law why that loss should be

laid upon the sellers.

We now turn to the second point, the validity of the disclaimer clause in the contract. What could be more clear to a buyer than the following contract language:

> The purchaser *agrees* that *full inspection* of said real estate has been made and that *neither* the *seller nor his assigns shall be held* to *any covenant* respecting the condition of *any improvements* thereon nor shall the . . . seller . . . be held to any covenant or agreement . . . relied on is contained herein or is in writing and attached to and made a part of this contract.

(Italics ours.) Clerk's Papers, at 9.

■ We emphasize again that the buyers, through their agent, sought out this property. They had ample opportunity to inspect. They had their own lawyer. The extent to which they inspected and used their lawyer was their choice. The contractual language is clear. This court not only should not, but it cannot, rewrite the clear agreement of the parties.

The buyers argue first that such a disclaimer must be clear and unambiguous. We find it to be so. Next, buyers contend that such disclaimer must be explicitly negotiated and that the sellers failed to prove that the disclaimer was so negotiated.

Buyers rely mainly upon *Berg v. Stromme,* 79 Wn.2d 184, 484 P.2d 380 (1971). There we held that the communicated particular needs of the buyer of an automobile would not be overcome by a boiler–plate exclusion of all warranties, express or implied. That case is quite different from this where the buyers sought no promises, the sellers made none, and the buyers with their lawyer, faced a clause which said the sellers not only made no covenant about the condition of the buildings, but expressly disclaimed any such covenant.

We do not hold that an implied warranty of habitability can never attach to the sale of an apartment complex. Rather we hold that such warranty does not exist under the facts of this case.

We reverse.

DOLLIVER, C.J., and UTTER, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

PEARSON, J. (dissenting)—The majority holds that the warranty of habitability does not apply to the Frickel–Sunnyside transaction, apparently because (1) the apartment complex was not built for resale, (2) the buyers were seeking a commercial investment, and (3) they failed to seek expert advice to determine the existence of structural deficiencies. Regardless, according to the majority, any potential warranty liability was effectively disclaimed by contractual disclaimer. I must dissent.

### INTRODUCTION

This court previously has recognized only one of the three reasons offered by the majority to justify its refusal to extend warranty protection to the Frickels as an element of the warranty of habitability. This court never before has suggested that warranty protection might depend upon whether the purchasers sought a commercial investment, or whether they sought expert advice to determine the existence of structural deficiencies. To the extent the majority relies upon these reasons to deny the Frickels warranty protection, such reliance constitutes a drastic alteration of the warranty's elements. To the extent reliance upon these reasons is not necessary to reach the result mandated by the majority, the majority simply adds confusing dicta to an already confusing area of the law.

Admittedly, this court previously has refused to extend warranty protection to a buyer unless the builder constructed the structure for purposes of resale. *See Klos v. Gockel,* 87 Wn.2d 567, 554 P.2d 1349 (1976). As discussed below, however, the "for purposes of resale" requirement is irrelevant to the extent it is applied to a nonprofessional builder, and insidious to the extent it is applied to a professional builder like Sunnyside. In fact, after reviewing our past decisions concerning the warranty of habitability, I am

convinced that few of the warranty's existing elements should retain validity. Many of these elements are supported largely by questionable rationale, potentially leading to unjust results.

To remedy this problem, a change in the common law of this state is necessary. In particular, this court should modify its past decisions in *Klos v. Gockel, supra,* and *House v. Thornton,* 76 Wn.2d 428, 457 P.2d 199 (1969) to make the warranty of habitability applicable to the sale of *any* residential structure constructed and sold by a professional builder, regardless of whether it was constructed for purposes of resale. This change would not only promote clarity and consistency in an otherwise confusing and inconsistent area of the law, but also would reflect those principles of justice we have sworn to uphold.

Although I will deal with each one of the majority's contentions in turn, my purpose is not to convince the court that the warranty of habitability applies to this transaction; under existing case law, it clearly does not. My intention is to demonstrate the inherent weakness in the rationale supporting the warranty's elements in the hope the court will recognize that the warranty should be modified and applied to the subject transaction. Before doing so, however, a brief history of caveat emptor and implied warranties in real estate transactions is appropriate.

CAVEAT EMPTOR AND IMPLIED WARRANTY

Implied warranties of one sort or another apply to the sale of an automobile, *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 554 P.2d 349, 83 A.L.R.3d 680 (1976); food, *Jeffries v. Clark's Restaurant Enters.,* 20 Wn. App. 428, 580 P.2d 1103 (1978); aircraft fuel, *Seattle Flight Serv., Inc. v. Auburn,* 24 Wn. App. 749, 604 P.2d 975 (1979); motor homes, *Massingale v. Northwest Cortez, Inc.,* 27 Wn. App. 749, 620 P.2d 1009 (1980); permanent waves, *Carpenter v. Best's Apparel, Inc.,* 4 Wn. App. 439, 481 P.2d 924 (1971); wheat, *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 649 P.2d 828 (1982); hay, *Libke v. Craig,* 35

Wn.2d 870, 216 P.2d 189 (1950); propane gas, *Kasey v. Suburban Gas Heat of Kennewick, Inc.,* 60 Wn.2d 468, 374 P.2d 549 (1962); commercial paper, RCW 62A.3–417; and investment securities, RCW 62A.8–306(2). In each of these examples, the doctrine of caveat emptor has given way to the protection of purchasers and investors, largely as a result of legal reform pioneered by court decision, which ultimately was codified in the Uniform Commercial Code.

As applied to the sale of real property, however, the doctrine of caveat emptor has had lingering effect. Bearman, *Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule,* 14 Vand. L. Rev. 541, 542 (1961). The doctrine of caveat emptor became imbedded in the common law during the 17th and 18th centuries. *See* Hamilton, *The Ancient Maxim Caveat Emptor,* 40 Yale L.J. 1133 (1931). Under this doctrine, "[t]he vendee took the property at his risk. If he failed to discover defects, *caveat emptor* prevented him from maintaining an action against the vendor." *Petersen v. Hubschman Constr. Co.,* 76 Ill. 2d 31, 38, 389 N.E.2d 1154 (1979). The rule "was based upon an arms–length transaction between the seller and buyer and contemplated comparable skill and experience". *Sloat v. Matheny,* 625 P.2d 1031, 1033 (Colo. 1981) (quoting *Tavares v. Horstman,* 542 P.2d 1275 (Wyo. 1975)).

At the end of World War II, houses were in great demand and were mass produced in "amazing quantities". "Almost inevitably . . . instances of poor quality resulted due to hurried construction and skimping on materials. Vendees . . . turned to the courts for relief." Bearman, 14 Vand. L. Rev. at 542. In response, the courts "extended, reshaped and in some instances distorted other areas of the law to fit their needs." Bearman, 14 Vand. L. Rev. at 543. This response constitutes a

> dramatic illustration of an important characteristic of the common law itself: an instance of the courts' filling what they felt was a gap in the law's protection by the utilization of dynamic and flexible legal concepts when the more archaic and immutable ones failed them.

Bearman, 14 Vand. L. Rev. at 543.

The "implied warranties of workmanlike construction and habitability arose in recognition of the anachronism of the common law rule of caveat emptor." *Sloat,* 625 P.2d at 1033. By implying these warranties, courts recognized that the seller and buyer "are not in an equal bargaining position and the buyer is forced to rely on the skill and knowledge of the builder." *Tavares,* 542 P.2d at 1282. The relative position of the builder–vendor to the buyer "dictates that the builder bear the risk that the house is fit for its intended use." *Sloat,* at 1033.

As noted by the Supreme Court of Colorado:

> These implied warranties are also consistent with the expectations of the parties. "Clearly every builder–vendor holds himself out, expressly or impliedly, as having the expertise necessary to construct a livable dwelling. It is equally as obvious that almost every buyer acts upon these representations and expects that the new house he is buying . . . will be suitable for use as a home. Otherwise, there would be no sale."

*Sloat,* at 1033 (quoting *McDonald v. Mianecki,* 79 N.J. 275, 289, 398 A.2d 1283 (1979)). Another reason for implying warranties is to "inhibit the unscrupulous, fly–by–night, or unskilled builder and 'to discourage much of the sloppy work and jerry building that has become perceptible over the years.'" *Capra v. Smith,* 372 So. 2d 321, 323 (Ala. 1979) (quoting *Cochran v. Keeton,* 47 Ala. App. 194, 198, 252 So. 2d 307 (1970)).

## WASHINGTON'S ASSAULT ON CAVEAT EMPTOR

In Washington, the assault upon the doctrine of caveat emptor began with *Hoye v. Century Builders, Inc.,* 52 Wn.2d 830, 329 P.2d 474 (1958). In *Hoye,* the plaintiff entered into a building contract with the defendant for the construction of a house. Due to defects in construction, the house apparently became uninhabitable. The issue was whether the construction contract contained an "implied warranty of fitness for habitation" where the contract only required the builder to provide labor and materials.

The court began its analysis on the assumption that caveat emptor would preclude an "implied warranty of fitness" if the parties had contracted for the sale of a new, completed house. *Hoye,* at 832. Nevertheless, the court held that, where the contract involved the construction of a dwelling, the contract contained "an implied warranty that the completed house would be fit for human habitation." *Hoye,* at 833. *Accord, Fain v. Nelson,* 57 Wn.2d 217, 356 P.2d 302 (1960). This warranty, which became known as the "warranty of workmanlike quality", represents the first assault upon the archaic barriers created by the doctrine of caveat emptor.

*House v. Thornton,* 76 Wn.2d 428, 457 P.2d 199 (1969) represents the second, and more important, assault on the doctrine of caveat emptor. In *House,* the builder–vendor constructed a house on an unstable site, leading to severe deterioration of the foundation. The plaintiffs first viewed the dwelling when it was substantially completed, and subsequently purchased it from the builder–vendor. After almost 2 years of occupancy, the house became unfit for further occupancy, and the plaintiffs sued the builder–vendor.

After noting that *Hoye* and *Fain* did not apply to the sale of a completed dwelling, the court nonetheless stated that "the present trend is toward the implied warranty of fitness and away from caveat emptor when it comes to the things which vitally affect the structural stability or preclude the occupancy of the building." *House,* at 434. The court went on to hold that, "when a vendor–builder sells a new house to its first intended occupant, he impliedly warrants that the . . . house is structurally safe for the buyer's intended purpose of living in it." *House,* at 436.

The warranty enunciated in *House,* which became known as the "warranty of habitability", was considered again in *Klos v. Gockel,* 87 Wn.2d 567, 554 P.2d 1349 (1976), the court's most recent decision in this area. In *Klos,* this court refused to impose liability under the warranty of habitability on the widow of a professional builder who, after her

husband's death, built three more houses, one of which allegedly was defective. *Klos,* at 572.

In *Klos,* this court refined the elements of the warranty of habitability first enunciated in *House.* First, the builder–vendor must be "regularly engaged in building, so that the sale is commercial rather than casual or personal in nature." (Citations omitted.) *Klos,* at 570. Second, the house must be constructed for purposes of resale, and not personal use. *Cf. Klos,* at 570. Finally, "the sale must be fairly contemporaneous with completion and not interrupted by an intervening tenancy . . ." *Klos,* at 571. The only exception to this final requirement exists where "the builder–vendor created such an intervening tenancy for the primary purpose of promoting the sale of the property." (Citation omitted.) *Klos,* at 571.

Together, *House* and *Klos* stand for the proposition that liability under the implied warranty of habitability only exists where: (1) the structure is a house, (2) the house is new, (3) the house was built for purposes of resale, (4) the sale was commercial, and (5) the defect complained of was structural and rendered the house uninhabitable.

Application of virtually any one of the aforementioned elements would justify this court's refusal to extend the warranty to the Frickel–Sunnyside transaction. Nevertheless, the majority apparently relies upon only one of the elements, number three, in refusing to apply the implied warranty of habitability to this case. Majority opinion, at 718–19. In addition, the majority apparently adds two more requirements, unmentioned in *House* or *Klos*; namely, that (1) the purchaser must not acquire the structure for investment purposes, majority opinion, at 720, and that, (2) regardless, the purchaser must seek expert help to determine whether structural defects exist. Majority opinion, at 720.

In my opinion, the two elements added by the majority are indefensible and do a great disservice to the existing doctrine underlying the warranty of habitability. More important, however, I believe several of the elements enun-

ciated in *Klos* and *House,* including the "for purposes of resale" requirement, are supported by little or no rationale. Accordingly, in support of my argument that the elements of the warranty of habitability should be modified, it is necessary to reveal the weaknesses in these elements.

CURRENT WARRANTY OF HABITABILITY

In Washington, the implied warranty of habitability currently is limited to the sale of new houses. *See Klos,* at 568; *House,* at 436; *Gay v. Cornwall,* 6 Wn. App. 595, 597, 494 P.2d 1371 (1972). Many jurisdictions impose a similar limitation on the warranty. *See, e.g., Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964). The structure purchased by the Frickels was an apartment complex. Accordingly, given the existing case law in Washington, the warranty arguably should not apply, notwithstanding the majority's opinion that the warranty might apply to such a transaction in the proper case.

As alluded to by Sunnyside, the rationale supporting this limitation flows from the notion that the average home buyer is ignorant of construction quality, whereas one who purchases commercial property is sufficiently sophisticated to demand an inspection, and sufficiently wealthy to afford one. *See generally Fain v. Nelson,* 57 Wn.2d 217, 223–24, 356 P.2d 302 (1960) (warranty protection does not extend to an experienced dealer in real estate who could have inspected a leaky roof but failed to do so). The weakness in this preconception manifests itself in the facts of this case.

The Frickels, whom the majority characterize as commercial investors, had no experience buying real property, other than that acquired in purchasing their home 30 years ago. Thus, one could hardly say they were sufficiently sophisticated to demand an inspection, even if they could afford one. Furthermore, the rationale supporting this limitation presupposes that inspection would reveal the defect. Adequate inspection of a foundation is very difficult because it is hidden once the structure is completed. In fact, the trial court found that the latent structural defects

in Sunnyside's construction could not reasonably have been observed at the site by the Frickels, even through the use of an expert contractor at the time the project was completed.

As the foregoing suggests, the court imposed requirement that the structure be a house is supported by questionable rationale. Other states have extended the warranty beyond houses. *See, e.g., Pollard v. Saxe & Yolles Dev. Co.,* 12 Cal. 3d 374, 380, 525 P.2d 88, 115 Cal. Rptr. 648 (1974) (apartment building); *Gable v. Silver,* 258 So. 2d 11, 18 (Fla. Dist. Ct. App. 1972) (condominiums). In *Allen v. Anderson,* 16 Wn. App. 446, 557 P.2d 24 (1976), the Court of Appeals considered the warranty in regard to a 4–unit apartment complex. Likewise, this court should extend warranty protection beyond houses to include all residential dwellings.

The implied warranty of habitability does not apply unless the dwelling is "new"; *Klos v. Gockel,* 87 Wn.2d at 568; *House v. Thornton,* 76 Wn.2d at 436; *Allen v. Anderson,* 16 Wn. App. at 448; *Gay v. Cornwall,* 6 Wn. App. at 595; but the court will consider a dwelling to be new if it was occupied to promote its sale. *Klos,* at 571. In short, "the sale must be fairly contemporaneous with completion and not interrupted by an intervening tenancy unless the builder–vendor created such an intervening tenancy for the primary purpose of promoting the sale of the property." *Klos,* at 571.

One reason for this limitation appears to be the need to insulate builders from liability for defects in older homes caused by intervening tenants. Although the limitation makes sense with respect to nonstructural defects (*e.g.,* damage to interior and exterior surfaces), it is unsupportable where the defects complained of are structural (*e.g.,* defective foundations and supporting beams). If neither age nor an intervening tenancy could affect the structural integrity of the dwelling, neither age nor the existence of an intervening tenancy is relevant to the question of whether the warranty liability should attach.[1]

---

[1]Not only is the "no intervening tenancy" requirement irrelevant, it also may

The newness requirement implies that a builder should not be liable for defects which become manifest long after completion of the structure. However, the builder limitation statute, RCW 4.16.310, bars commencement of a suit that does not accrue within 6 years of substantial completion. Accordingly, the builder need not warrant the quality of his construction indefinitely, but rather for merely 6 years. This requirement is not unreasonable, especially where the defect complained of is latent and structural. *See, e.g., Barnes v. Mac Brown & Co.*, 264 Ind. 227, 342 N.E.2d 619 (1976) (court extended warranty coverage to second purchaser where defect in basement wall failed to materialize until after second purchaser took possession). Accordingly, this court should not limit warranty protection to the sale of new residential structures.

This court will imply the warranty of habitability only to "commercial rather than casual or personal" sales. *Klos,* at 570. In my opinion, this means the builder must be in the business of building residential structures. The reason for the requirement flows from the justifiable belief that a nonprofessional house builder should not be deemed to warrant the same quality of construction demanded of his professional counterpart. Consistent with this belief, this court limits the liability of one who builds a dwelling for his personal residence, and subsequently sells it to another. Because such a builder's construction is casual and for personal purposes, I agree that liability for defective construction should not attach. Accordingly, I do not suggest that the warranty of habitability should apply to nonprofessional builders, but rather that the warranty should apply to a professional builder, regardless of whether he also is in the business of selling residential structures.

Even if the builder is a professional, this court will not

---

serve to defeat the warranty rights of a deserving purchaser. Intervening tenancies which do not promote sale will insulate the builder–vendor from the implied warranty. Thus, builders could live temporarily in a dwelling to negate the warranty. *See, e.g., Klos v. Gockel,* 87 Wn.2d 567, 570, 554 P.2d 1349 (1976).

imply the warranty of habitability unless the residential structure was built for purposes of resale. *Klos,* at 570. Although Sunnyside clearly is a professional builder, *i.e.,* in the business of building, it did not build Sunnyside Sands for the purposes of resale. As late as the completion of phase two of construction, Sunnyside intended to operate the apartment complex for its own benefit. The majority emphasizes this fact throughout its opinion, arguing that this alone justifies refusal to extend the warranty to this case.

This limitation was stretched to its outer limits in *Klos v. Gockel,* 87 Wn.2d 567, 554 P.2d 1349 (1976). In *Klos,* the court found that Mrs. Gockel constructed the house "primarily for personal occupancy, but also with the idea that eventually the house might be sold." *Klos,* at 568. This view is questionable. Mrs. Gockel and her husband had been in the business of building, occupying and then selling houses for many years. After her husband's death, she built the defective house, lived in it approximately 1 year, and then sold it; built a second house, lived in it for a time, and then moved to Arizona. Upon her subsequent return to this state, she built a third house. *Klos,* at 569 n.1. Mrs. Gockel clearly built each of the houses for purposes of resale. Nevertheless, the principle enunciated in *Klos v. Gockel,* read in context with the facts set forth in the opinion, lends support to the contention that the warranty should not run to the Frickels.

The question is whether the requirement set forth in *Klos v. Gockel* should retain validity. This court already requires a commercial builder to be "regularly engaged in building" before it will impose warranty liability. *Klos v. Gockel, supra* at 570. This requirement precludes imposition of warranty liability upon a nonprofessional builder who sells a home constructed originally as his own residence. The requirement that the dwelling be built for purposes of resale is simply cumulative when applied to the nonprofessional builder, and thus is irrelevant in that context. The requirement is insidious, however, when applied

to the routine practice of a professional builder, like Mrs. Gockel, who constructs a dwelling, occupies or rents it for personal purposes, and then sells it to one who relies on the builder's reputation as a professional. In this latter case, form prevails over substance and the warranty is denied one who deserves its protection.

The record in this case clearly shows that Sunnyside is a commercial builder, regularly engaged in the business of building apartment complexes. Although Sunnyside originally did not intend to sell the complex when construction began, it would be spurious to suggest that this fact, even if known by the Frickels, would have caused them to lessen their reliance on Sunnyside's skill and reputation as a professional builder.

The commercial builder–vendor is responsible for defects because he controls construction, is in a position to inspect, and holds himself out as a professional. If construction is defective, an innocent purchaser should not bear the loss. Accordingly, warranty protection should not depend upon satisfaction of the "for purposes of sale" requirement.

As it now exists, the implied warranty is one of habitability. *Klos v. Gockel, supra* at 570. In *Klos,* the court explained the concept of habitability as follows:

> As a final matter, we note that the house was habitable at all times. The gist of the implied warranty is that the resulting building will be fit for its intended use, *i.e.,* habitation.
> . . . The respondents never moved out of the house and were still occupying it at the time of trial. . . .

(Citations omitted.) *Klos,* 571.

Although the court in *Klos* relied upon failure to move out as evidence of habitability, moving out cannot be the "acid test" of habitability. In *House v. Thornton,* 76 Wn.2d 428, 457 P.2d 199 (1969) the plaintiff remained in the defective house 23 months before bringing suit. This court found that the house was uninhabitable without mentioning whether the plaintiffs moved out. The Court of Appeals reached a similar result in *Gay v. Cornwall,* 6 Wn. App.

595, 494 P.2d 1371 (1972).

Furthermore, in the landlord–tenant area, breach of the implied warranty of habitability is a defense to an unlawful detainer action. *Foisy v. Wyman,* 83 Wn.2d 22, 515 P.2d 160 (1973). In this situation, the tenant, by definition, is living in the dwelling when the court deems it uninhabitable. Furthermore, although the tenant is required to vacate the premises to have a valid claim of constructive eviction, a tenant may prove constructive eviction without proving actual uninhabitability. *See* Stoebuck, *The Law Between Landlord and Tenant in Washington,* 49 Wash. L. Rev. 291, 348 (1974). Accordingly, the doctrine of constructive eviction is not strictly tied to the concept of habitability.

The concept of habitability is ill suited to the facts of this case, and most cases involving alleged building defects. The Frickels, for example, are not claiming that Sunnyside Sands is uninhabitable as to them personally; they do not live in the complex and apparently have suffered few vacancies as a consequence of the defects. Reduced to its essence, the Frickels' claim is that Sunnyside sold them a defective, not uninhabitable, residential structure. In my opinion, this claim is analogous to a claim for breach of the implied warranty of merchantability. *See* Comment, *Washington's New Home Implied Warranty of Habitability—Explanation and Model Statute,* 54 Wash. L. Rev. 185, 211 (1978).

Regardless, as a matter of public policy, this court should not require a purchaser to move out of his home before seeking warranty protection from the builder–vendor. When a builder places a residential structure in the stream of commerce, he should be deemed to warrant that the structure is free from serious structural defects, not that the purchaser will not be forced to move out of his home.

PROPOSAL FOR CHANGE

As demonstrated by the foregoing discussion, questionable rationale supports all but one of the elements of the

warranty of habitability. To understand why, one need only recall that the doctrine of caveat emptor once governed all real estate transactions. To mitigate the injustice inherent in that doctrine, courts around the country created the common law warranties of workmanlike quality and habitability. Uncomfortable with the prospect of broad builder–vendor liability, however, the courts imposed certain elements on a case–by–case basis, without much consideration of the rationale supporting these elements. Unfortunately, we are left today with requirements which make little or no sense, and lead to unconscionable results.

To rectify this problem, this court should modify the existing warranty of habitability and apply it to serious structural defects existing in any residential structure constructed by a professional builder, regardless of whether the buyer is the first or subsequent occupant of the structure. *Accord, Oates v. Jag, Inc.,* __ N.C. __, 333 S.E.2d 222 (1985) (builder owes duty of reasonable care to anyone who might foreseeably be injured by defective construction, including subsequent purchasers). This modified warranty of habitability would apply to all residential structures, whether single–family houses, duplexes, apartments or condominiums. Furthermore, the warranty would apply regardless of whether the structure was built for purposes of resale, as long as the builder–vendor was a professional builder in the business of building. Finally, the warranty would apply regardless of whether the structure was new, meaning that intervening tenancies would not destroy warranty protection.

Although at first glance this might appear to be a heavy burden to impose upon professional builders, the duration of the warranty would be limited statutorily to 6 years from the date the structure is substantially completed. RCW 4.16.310. Furthermore, the warranty would apply only to professional builders and would cover only serious structural defects. Finally, where the purchaser is acquiring the property for investment purposes, the court could hold that a contractual disclaimer is permissible.

In short, imposition of the warranty of habitability, as described, would not be unreasonable given the large sums of money involved and the reliance generally placed upon professional builders by unsuspecting purchasers. Accordingly, I would modify *Klos v. Gockel, supra,* and *House v. Thornton, supra,* and would impose instead the warranty of habitability in all sales of residential property. Because Sunnyside is a professional builder and Sunnyside Sands is a residential complex, I would hold that the Frickels are entitled to warranty protection.

## DISCLAIMER OF WARRANTY

The majority argues that even if an implied warranty applies, it was disclaimed by inspection and contract. The first argument can be disposed of summarily.

Although the Frickels did inspect the manager's apartment and one or two others, the trial court found the structural defects could not have been detected on the site by anyone, not even an expert. In *Tyus v. Resta,* 328 Pa. Super. 11, 476 A.2d 427 (1984), the court stated:

> A reasonable pre–purchase inspection requires examination of the premises by the intended purchaser—not by an expert. Defects which would not be apparent to an ordinary purchaser as a result of a reasonable inspection constitute latent defects covered by the implied warranties.

*Tyus,* at 22. In the context of a commercial investment in residential property, I would not hold that an implied warranty cannot be disclaimed by expert inspection; commercial investors should be expected to seek expert advice. However, where even an expert would be unable to detect a latent defect, a purchaser's cursory inspection cannot serve to disclaim an implied warranty.

The more important question in this case, however, is whether an implied warranty can be disclaimed by contract. The majority attempts to elevate the following contract language to the level of a disclaimer:

> The purchaser agrees that full inspection of said real estate has been made and that neither the seller nor

his assigns shall be held to any covenant respecting the condition of any improvements thereon nor shall the purchaser or seller or the assigns of either be held to any covenant or agreement for alterations, improvements or repairs unless the covenant or agreement relied on is contained herein or is in writing and attached to and made a part of the contract.

Majority opinion, at 716.

As yet, Washington courts have not determined the validity of disclaimers of the implied warranty of habitability. In the landlord–tenant area, this court held that such disclaimers contravene public policy. *Foisy v. Wyman,* 83 Wn.2d 22, 28, 515 P.2d 160 (1973). Arguably, the result should be the same in the new house context. Nevertheless, courts have validated such disclaimers if the language clearly and unambiguously demonstrates the intention of both parties to disclaim the implied warranty. *See Conyers v. Molloy,* 50 Ill. App. 3d 17, 22, 364 N.E.2d 986 (1977).

In my opinion, disclaimer of an implied warranty under the facts of this case does not contravene public policy. Unlike the purchaser of a new house, the Frickels purchased the dwelling for purposes of investment. If they desired to disclaim the warranty, the law should not prevent them from doing so, even if their disclaimer insulates a shoddy contractor from liability. The question remains, however, whether the Frickels did disclaim the implied warranty by signing a contract containing the above quoted language.

Reasoning by analogy to Washington's commercial code, I believe a valid disclaimer of the implied warranty of a residential structure should be written, conspicuous, and include the term "habitability". *See* RCW 62A.2–316(2). Furthermore, the disclaimer should be explicitly negotiated. *See Berg v. Stromme,* 79 Wn.2d 184, 484 P.2d 380 (1971); *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 554 P.2d 349, 83 A.L.R.3d 680 (1976).

In an ordinary sale of goods, the requirements of conspicuousness and express reference to "merchantability" under RCW 62A.2-316(2) are not mandatory. RCW 62A.2-316(3). Subsection (3) states that "[n]otwithstanding subsection (2)", the implied warranty can be disclaimed by language which clearly excludes any implied warranty. However, given the nature of the transaction in this case— sale of an expensive residential complex—the requirements of subsection (2) should prevail over subsection (3). 54 Wash. L. Rev. at 215 n.153. In *MacDonald v. Mobley,* 555 S.W.2d 916 (Tex. Civ. App. 1977) involving the disclaimer of a new house warranty, the court relied on the Texas equivalent of subsection (2), invalidating the disclaimer because it was not conspicuous. *MacDonald,* at 919. In my opinion, this court should adopt the same rule with respect to the disclaimer of implied warranties in the context of sales of residential property.

Even assuming the contract language relied upon by Sunnyside evinces an intent to disclaim implied warranties, this language does not include the term "habitability" and was not explicitly negotiated. The pertinent phrase simply stated that Sunnyside "shall [not] be held to any covenant respecting the condition of any improvements" on the real estate. Furthermore, the record clearly shows the parties neither discussed nor negotiated this term. Mr. Frickel testified that he was totally unfamiliar with a warranty clause. Accordingly, assuming the court applies the implied warranty of habitability to this transaction, the facts do not support the majority's contention that the Frickels waived all warranties.

In sum, I would hold the implied warranty of habitability in the sale of residential real property can be disclaimed only where the property is acquired for investment purposes, and the disclaimer (a) is explicitly negotiated, (b) is written and conspicuous, and (c) includes the term "habitability". In my opinion, these requirements were not met in

738

this case, and accordingly I would affirm the decision of the trial court.

DORE and CALLOW, JJ., concur with PEARSON, J.

Reconsideration denied December 8, 1986.

